Patrick O. CLEMANS, Appellant,

v.

STATE of Alaska, Appellee.

No. 7584.

Court of Appeals of Alaska.

April 27, 1984.

---

Daniel W. Westerburg, Birch, Horton, Bittner, Pestinger & Anderson, Anchorage, for appellant.

Michael N. White, Dist. Atty., Palmer, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

Patrick O. Clemans pled no contest to two charges of manslaughter. AS 11.41.-120(a)(1). Superior Court Judge Seaborn J. Buckalew sentenced Clemans to serve two concurrent terms of eight years, with two years suspended. Clemans appeals his sentence, arguing that Judge Buckalew committed plain error in considering inflammatory and unduly emotional sentencing evidence. Clemans also contends that Judge Buckalew did not properly explain the sentence he imposed. Finally, Clemans maintains that his sentence is excessive. We affirm.

## THE OFFENSE

On the morning of December 5, 1981, Clemans rented a car in Anchorage and drove to the lodge at the Alyeska Ski Resort in Girdwood. He spent the day in the bar, celebrating his birthday. Between four and four-thirty that afternoon, Clemans left the lodge, returned to his car and began driving back toward Anchorage. A short distance from the lodge, at mile 2.5 of the Alyeska Highway, Clemans attempted to pass another car. He lost control of his car and spun off the road into a snow berm. As Clemans' car slid out of control, it hit two children, Wesley Gerrish, age ten, and his brother Scott, age thirteen. Both boys had been walking along the shoulder of the roadway toward their home. Both were killed by the impact of Clemans' car.

The area in which the collision occurred was residential. The shoulder of the road was the only available pathway and was frequently used by pedestrians. At the scene of the collision, the roadway was forty-two feet wide, with a twelve-foot traffic lane and an additional nine feet of plowed pavement on each side. Both Scott and Wesley Gerrish were apparently well to the side of the road, off of the traffic lane, when struck by Clemans. The condition of the roadway was normal for winter driving, with ice and a thin covering of snow on the pavement.

The posted speed limit where Clemans lost control of his car was thirty miles per hour. Witnesses indicated that Clemans was traveling extremely fast and estimated his speed at somewhere between fifty and sixty miles per hour. Upon impact with Clemans' car, Scott Gerrish was thrown approximately 160 feet through the air; Wesley Gerrish was thrown approximately 106 feet.

Witnesses who saw Clemans at the scene of the collision and immediately before he left the Alyeska Lodge described him as obviously intoxicated. A trooper who contacted Clemans at the scene of the collision approximately an hour after it occurred indicated that Clemans was unable to recite the alphabet or repeat basic number sequences. Clemans was arrested after failing to perform field sobriety tests satisfactorily.

A blood test was performed about five hours after the collision. The test showed Clemans' blood-alcohol content to be 156 milligrams per milliliter, the equivalent of a .156 breathalyzer reading. Based on this result, a pathologist concluded that Clemans' probable blood-alcohol level at the time of the collision was between 200 and 230 milligrams per milliliter.

## THE OFFENDER

At the time of the offense, Clemans was thirty-one years of age. He had attended college for four years and had a steady history of employment, primarily as a surveyor and as a civil engineering inspector. During the time between the offense and sentencing, Clemans was employed as a computer technician.

Clemans had been married once and was divorced. He had two children, who lived with his former wife. Clemans regularly made substantial payments for child support, as required by his divorce decree. Within the five-year period prior to the offense, Clemans had been convicted of five minor traffic offenses, four for moving violations and one for improper equipment. Clemans had never been charged with or convicted of any criminal offense prior to this case.

A psychological report prepared for use in sentencing was highly favorable to Clemans. The report indicated that Clemans was an intelligent and capable person who had no significant emotional or psychological disorders. The report found no sign of any alcohol or drug abuse problem and concluded that Clemans was not likely to develop a problem of drug or alcohol abuse in the future. According to the report, Clemans suffered considerable grief and remorse as a result of his conduct, and he was willing to accept responsibility for the offense. Because of the offense, Clemans had entirely ceased the use of all alcoholic beverages, and he was genuinely motivated

to help other potential offenders to avoid becoming involved in a similar crime. The psychological report noted that Clemans' intelligence and his ability to communicate well with others would likely make him highly effective in performing community work with potential alcohol abusers.[1] The favorable views expressed in Clemans' psychological report are supported by the statements and testimony of a number of other persons acquainted with Clemans.

The presentence report also presented a favorable view of Clemans' character. The author of Clemans' presentence report indicated that Clemans' "grief is real and will probably always be with [him]." The presentence report stated that "Mr. Clemans is not a criminal. He is a man who has committed an isolated and horrendous criminal act." The report concluded that Cle-

mans did not require further rehabilitation or need to be deterred from committing future criminal acts. Although the author of the report recommended a substantial sentence of incarceration because of the serious nature of the offense, he cautioned against imposition of a sentence that would "dehabilitate" Clemans.

## SENTENCING PROCEEDINGS

The presentence report prepared in this case contained extensive information concerning Clemans' background, his offense, and the effects of the offense on Clemans' life. The report also went into considerable detail about the lives of Scott and Wesley Gerrish and the effect of their deaths on their family and on the community of Girdwood.[2] Clemans made no objections to

---

1. According to the presentence report, Clemans' former wife was contacted and indicated that Clemans had an alcohol abuse problem. A supplement to the presentence report, however, pointed out that Clemans' divorce had been an acrimonious one and that statements by his former wife were therefore potentially unreliable.

2. Under the heading "Statement of Victim's Next of Kin," the presentence report gave the following information:

 This officer interviewed the victim's parents, Nalani and Lee Gerrish. The Gerrishes report that their children were exceptional individuals who had already made an impact on several adults. They report that Scotty was already philosophizing on world hunger, war, killing and suffering, at the age of thirteen. The children were described as open and adaptable and looking forward to the family's move to Hawaii.

 Mr. Gerrish reports that for months prior to the accident he had a premonition that death was going to appear in his family. He had discussed that feeling with his wife and prayed to God. However, they felt that losing a child to crib death had already been their own personal tragedy. They report that the first three or four months after the accident was a "fog". "Every morning, if you could sleep, we wake up and look for them". They continued to take life "day by day, and if it gets rough, hour by hour". They never returned to the family home in Girdwood since the accident. Lee states that for weeks following the accident a weakness would overtake him, "as if my energy were being taken". Nalani reports a "peeling away—a physical emptiness". Both feel that [they] will have a

 void for the rest of their lives. The Gerrishes can have no more natural children. They have discussed adoption but feel "even if we get two or three or four children and raise them to be adults, it wouldn't replace the boys". They report that even the sight of a laughing child is difficult for them to bear.

 They report that their family was very spiritual and comfort themselves with the belief that "the boys had other things to do spiritually". Nalani stated she would encourage the court to give Mr. Clemans a stiff sentence as she believes it would set a precedent and possibly deter others.

 This officer also interviewed the victim's paternal grandmother, June Gerrish, and the victim's paternal aunt, Janice. They report that the extended family was extremely close and shared all holidays including birthdays together. They report that Scottie and Wesley were the end of the Gerrish name as there are no more males who bear the surname in the family. Mrs. Gerrish reports that the shock has devastated the family, "The shock hasn't ended. Every night I go to bed I think of it. Every morning when I wake up I think of it". Mrs. Gerrish also reports that her husband, Ray, still will not talk about the accident and refuses to even hear about it. "Clemans destroyed a complete full family. The tension at the house (can now) be cut with a knife, especially when Lee and Nalani are there."

 Janice stated that she feels guilty "because I still have mine (children) and they don't have theirs". She also reports that, "I don't cry for the boys anymore. I cry for Lee and Nalani. They'll never have kids or grandchildren again". Janice believes that the defendant should receive, "a good stiff sentence". June

the information contained in his presentence report.

At Clemans' sentencing hearing, the state called Scott and Wesley Gerrish's mother, father and grandmother as witnesses. Each testified about the effects of the boys' deaths on the Gerrish family. In addition, the boys' grandmother testified that their deaths had prompted her to start an Alaska Chapter of Mothers Against Drunk Driving (MADD), a nationwide nonprofit organization that works to combat drunken driving. Clemans did not object to these witnesses or to their testimony.

Clemans also presented a number of witnesses at the sentencing hearing. Clemans' mother testified that Clemans had always been strongly opposed to violence, that he had been a conscientious objector, and that this offense had therefore had a particularly strong effect on his life. Two friends of Clemans also testified. Both were experienced in psychological counseling and emphasized the extent of grief and remorse suffered by Clemans as a result of the offense. Both also stressed that Clemans was committed to working with po-

tential drunk driving offenders, in an effort to prevent future alcohol-related traffic deaths. Both friends testified that they believed Clemans would be highly effective in performing this type of community service. The psychologist who had been designated to examine Clemans prior to sentencing was also called as a witness and elaborated on the statements he had previously made in his written report to the court. He reiterated his belief as to the sincerity and appropriateness of Clemans' remorse and stated that Clemans was unlikely to be involved in additional criminal behavior. Finally, Clemans presented testimony by the executive director of the Clitheroe Center, an institution providing alcohol rehabilitation services in Anchorage. He testified that he had spoken with Clemans and believed Clemans could be highly effective in working with potential drunk drivers.

In its sentencing argument, the state, to a certain extent, questioned the sincerity of Clemans' remorse. However, the primary emphasis of the state's argument was Clemans' conduct and the circumstances of the

Gerrish believes that the defendant should be "sent to jail, miss his family and friends, not be home for a holiday, and sit in jail for a long time and think what he has done".

The accident has caused June Gerrish to form a MADD chapter (Mothers Against Drunk Drivers) in Alaska . . . .

In a subsequent portion of the presentence report, entitled "Collateral Contacts," the author included, in part, the following information:

The Commissioner of Public Safety for the Municipality of Anchorage, John Franklin, was contacted. Mr. Franklin was present in the emergency room of Providence Hospital when Lee and Nalani Gerrish learned of the death of their children. Mr. Franklin states that the mother's reaction was to throw herself up against the wall with arms outstretched, screaming. Mr. Franklin notes that it was as if they were watching Christ being crucified. Mr. Franklin also noted that everyone present in the emergency room was tearful, including doctors and nurses who are usually hardened to that type of emotional scene. Mr. Franklin states that the Gerrishes were "totally devastated" by the accident. He states the question remains in his mind, as in everyone's mind, "why . . . why . . . why?".

This officer contacted Mr. Henry, principal of the Girdwood Elementary School. Mr.

Henry stated that both Scott and Wesley Gerrish were excellent students and good citizens. Mr. Henry also noted that the municipal public library, which is attached to the school building, was renamed the Scott and Wesley Gerrish Memorial Public Library in honor of the victims.

Mary Klopfer, Scott Gerrish's seventh grade teacher, stated the victim was a "straight A student" with a "fantastic academic background" and plans of becoming a doctor. Kenneth Harger, Wesley Gerrish's fifth grade teacher, stated Wesley was "well-behaved" but a "little mischievous." Mr. Harger also stated the victim was the best athlete in his class. Both teachers note the impact of the accident on the Girdwood community remains strong, even after the passing of a year.

Lieutenant Ron Miller of the Anchorage Paramedics, notes that Lee Gerrish had to be physically restrained from hurting himself upon learning of the deaths of his sons. Larry Langston, chief of the paramedics, states that a Girdwood auxiliary paramedic who responded to the accident was so emotionally devastated, he has never responded to another emergency call. Tom Kempton, paramedic and close friend of the family, describes Lee and Nalani Gerrish as careful parents who were devastated by the accident.

offense. The state stressed the extent of Clemans' intoxication and the nature of his driving, which it characterized as extremely reckless. The state also asked the court to consider the seriousness of alcohol-related vehicular manslaughter cases. The state relied on statistics reflecting the high incidence of such crimes and maintained that under Alaska case law, primary weight in sentencing should be given to deterrence of others and reaffirmation of societal norms. Thus, the state urged the court to impose a substantial term of incarceration.

In his own sentencing argument, Clemans stressed, through counsel, that he fully accepted responsibility for the loss of life that he had caused. Clemans repeatedly stated that he did not wish to deny the tragic effects of his conduct on the Gerrish family. However, Clemans pointed out his favorable background and emphasized the impact of the offense on his own life. According to Clemans, he had even considered committing suicide as a means of showing his remorse. Relying on his feelings of guilt and remorse, Clemans underscored his commitment to devote his talents to working against drunken driving by speaking to potential offenders about his own experience.

Clemans recognized that he should be required to serve a substantial period of imprisonment. However, he argued that an unduly long term of incarceration was not necessary. He urged the court not to impose a sentence so stringent that it would prevent him from fulfilling his commitment to community service. Clemans vigorously maintained that the value of his work with potential drunk driving offenders would far exceed any deterrent effect that might be achieved by imposition of a lengthy term of imprisonment. Clemans thus asked the court to impose a sentence

of no more than eighteen months of unsuspended time to serve.[3]

In imposing sentence, Judge Buckalew indicated his concern with the loss suffered by the parents and grandmother of the victims. Judge Buckalew stated that he found it difficult to sympathize with Clemans and that Clemans' case involved very "tough facts." Clemans, speaking personally in his own behalf, attempted to explain that there were factors other than his intoxication and recklessness that led to his losing control over his car. However, Judge Buckalew rejected his explanation and expressly adopted the facts relied on by the prosecution contained in the presentence report.

Judge Buckalew was satisfied that Clemans did not need further rehabilitation and that he did not require deterrence. Nevertheless, the judge concluded that a lengthy sentence was appropriate in order to deter others and reaffirm societal norms. Judge Buckalew stated, in relevant part:

> But I want to make it abundantly clear to you that I've taken the position that the representations made by the state are the facts, and those facts are sufficient for me to form a judgment, and it's my opinion that you were speeding in a residential area, you have acknowledged you had a high blood alcohol. You lost control of that car. The only cause for losing control of that car, as far as I'm concerned, is the ingestion of alcohol. And it's my further belief that the facts demonstrate that the children were well off the road, and if you hadn't lost control of the car, of course they'd be alive.
>
> And I'm going to sentence you to what I consider to be a fair sentence, and a just sentence, but my primary consideration is the deterrence of others, the reaffirmation of societal norms; I have a

**3.** Clemans also maintained that a sentence of this length was permissible under Alaska case law dealing with alcohol-related driving deaths. He further pointed out that his proposed sentence would be consistent with other drunken driving manslaughter sentences imposed by Judge Buckalew. Clemans' counsel cited two

specific cases, one involving a three-year sentence and the other involving a four-year sentence. Clemans argued that his favorable background and the circumstances of his case indicated the suitability of a more lenient sentence than was imposed by Judge Buckalew in either of the two prior cases.

double vehicular manslaughter, and the facts are almost classic. Somebody spends four or five hours in a bar, steps out of the bar, gets into an automobile and within minutes—within minutes, we have two deaths. And for whatever reason, these kinds of cases crop up all the time, and Americans more than any other people on this planet, for whatever reason, kill each other through these automobiles much more than the English or the Germans or the Spanish or anybody else.

. . . .

And I think I have to impose a meaningful amount of time to serve. I think that my sentence has to be of such a length that if anybody reads it, they are going to see that if they get in a car, you get on the road and you kill somebody—it doesn't make any difference what kind of work record you have, what kind of remorse you have or anything else. Jail is certain, and you and your counsel had acknowledged that.

Accordingly, Judge Buckalew sentenced Clemans to serve two concurrent eight-year terms of imprisonment. He suspended two years in each case. As a condition of the suspended portion of the sentence, the judge required Clemans to complete 200 hours of community service. Clemans subsequently filed this appeal.

## DISCUSSION

A. *Sentencing Court's Consideration of Inflammatory and Unduly Emotional Evidence*

Clemans first argues that portions of the presentence report describing Scott and Wesley Gerrish and the impact of their deaths on the Gerrish family and on the community of Girdwood were irrelevant, highly inflammatory and unduly emotional. Clemans argues that the same is true of the testimony given by the Gerrish boys' parents and grandmother at the sentencing hearing. Despite his failure to object to the presentence report or to the testimony at his sentencing hearing, Clemans contends that Judge Buckalew committed plain error by relying on the improper sentencing evidence.

Clemans bases his claim on the supreme court's decision in *Sandvik v. State,* 564 P.2d 20 (Alaska 1977). In *Sandvik,* a drunken driving manslaughter case involving the death of a young girl, the presentence report was challenged prior to sentencing. In a section headed "The Victim," the report contained an emotional narrative describing the life of the victim and the impact of her death on members of her family and her community. Sandvik contended that the information concerning the victim and her background was unduly emotional and inherently prejudicial. Sandvik thus asked the sentencing judge to strike the information or order preparation of a new presentence report. Based on the inherently prejudicial nature of the report, Sandvik also requested the sentencing judge to reassign the case to another judge after deletion of the challenged evidence. The sentencing judge denied this request, but stated that he would disregard irrelevant information in the presentence report. *Id.* at 21–22.

On appeal, the majority of the court in *Sandvik* declined to require a new sentencing hearing. The court cautioned that basic information concerning crime victims is necessary to assure that sentences are not imposed in an "informational vacuum." *Id.* at 23. According to the court, this information was relevant even though the offense charged did not involve an intentional crime, and even though the identity of the victim was purely a matter of circumstance. *Id.* at 23 and n. 6. The court went on to find, however, that portions of the presentence report "were unnecessarily detailed, emotional, and not particularly relevant." *Id.* at 24. Nevertheless, the court held that inclusion of this information was harmless error because it was disregarded by the sentencing judge. *Id.*

Clemans points out the similarity between the information about the victims in his presentence report and the information challenged in *Sandvik.* He notes, more-

over, that Judge Buckalew affirmatively expressed his sympathy for the victims and their family. Thus, Clemans maintains that, unlike the sentencing court in *Sandvik*, Judge Buckalew failed to disregard the challenged evidence. Clemans concludes that the court's reliance on the challenged evidence deprived him of a fair sentencing hearing and that he is therefore entitled to a new hearing.

 Because Clemans failed to make a timely objection before being sentenced, we will review this argument only to determine whether Judge Buckalew committed plain error. Alaska R.Crim.P. 47(b). Under the plain error doctrine, we will not take notice of an error unless it affects a substantive right and is obviously prejudicial. *Van Hatten v. State*, 666 P.2d 1047, 1055 (Alaska App.1983).

 We have previously held that a finding of plain error will normally be inappropriate where the defendant's failure to object might have been tactical. Our reluctance to find plain error in such cases stems in part from the need to assure that a party who seeks to gain an advantage by choosing to withhold an objection is not permitted to adopt an inconsistent strategy after the initial one fails. Furthermore, we believe that the willingness of a party to forego an objection in order to gain a tactical advantage provides a reliable indication that, in the perception of that party, the failure to object was not likely to result in serious prejudice. Finally, a party's decision not to make a timely objection precludes the trial court from taking measures to correct possible error. Here, for example, if an objection had been made, Judge Buckalew might well have disregarded the challenged portions of the presentence report, as did the sentencing judge in *Sandvik*.

In this case, we cannot say with certainty that Clemans' trial counsel[4] decided as a tactical matter not to call the *Sandvik* case to Judge Buckalew's attention and not to object to the presentence report or to the testimony of the state's witnesses at the sentencing hearing. Nevertheless, the sentencing record creates a strong impression that the absence of an objection was the result of a tactical choice.[5] The record

4. Clemans' counsel on appeal did not represent him in the superior court.

5. Clemans contends that there was no reason for a tactical waiver of the *Sandvik* issue. However, it is apparent from the record that Clemans might have had two substantial reasons to forego any objections to the sentencing evidence. First, the position adopted by Clemans at the sentencing hearing was basically inconsistent with raising objections to the information. Clemans' approach to sentencing was to freely admit responsibility for his conduct and to acknowledge fully the grief and suffering that his offense had caused. Clemans repeatedly acknowledged the effect of his offense on the Gerrish family, and he repeatedly stated that it was not his purpose to contest the evidence. In fact, Clemans sought to impress upon the court the fact that he, too, had suffered severely as a result of the tragic deaths of the Gerrish boys. Clemans' witnesses sought to establish that the death of the boys had had a profound influence on Clemans' life. Clemans also sought to convince the court that he wanted to devote a major portion of his life to helping prevent others from committing similar offenses. In keeping with this approach, Clemans expressly argued that part of his decision to forego trial and not to contest the accuracy of the state's sentencing evidence was based on a personal desire to avoid causing the Gerrish family any additional suffering. Given Clemans' approach toward sentencing, it would have been inconsistent for him to challenge sentencing evidence concerning the impact of the offense on the Gerrish family. Had Clemans objected, he would have appeared contentious, and possibly not genuinely remorseful. Moreover, any attempt to convince the court that evidence of the Gerrish family's grief was irrelevant would have been wholly incompatible with Clemans' attempt to demonstrate his own remorse and suffering by emphasizing the profound effects of the offense on his life.

Second, had Clemans successfully raised the *Sandvik* issue, he would have faced a substantial risk that Judge Buckalew might disqualify himself and reassign the case to another judge for sentencing. *See Sandvik*, 564 P.2d at 29 (Boocheever, dissenting) (where inherently prejudicial material is included in a presentence report, the possibility of subconscious prejudice requires the sentencing judge to order deletion of material and reassignment of the case to another judge). Clemans might well have believed that retaining Judge Buckalew for sentencing purposes would be to his advantage. At sentencing, Clemans' counsel specifically relied

shows that Clemans' counsel, an experienced practitioner of criminal law, was intimately acquainted with prior Alaska sentence appeals in drunken driving manslaughter cases. The record also shows that Clemans' counsel was fully aware of prior sentences imposed by Judge Buckalew in similar cases. On appeal, Clemans has not argued that his counsel at sentencing was ineffective. Nor has Clemans made any showing that his counsel was unaware of the supreme court's decision in *Sandvik*. In the absence of such a showing, the strong possibility of tactical waiver in this case leads us to conclude that Clemans' failure to object should be excused only if it appears from the record that Judge Buckalew was in fact unduly swayed by irrelevant and prejudicial evidence and that the sentence he imposed was based on improper considerations.

From our review of the record, it does not appear that Judge Buckalew's sentence was based on improper considerations. Although the presentence report's treatment of Scott and Wesley Gerrish's background and the impact of their deaths on members of their family is quite similar to the narrative in the presentence report considered by the supreme court in *Sandvik*,[6] we do not believe that the holding in *Sandvik* is as broad as Clemans suggests.

Clemans urges us to find that, under *Sandvik*, only limited information concerning the effect of a crime on the actual victim may be considered by the sentencing court and that the court is entirely precluded from considering any evidence concerning the effects of the victim's death on family members or other individuals. Thus, Clemans objects to the presentence report and testimony in this case primarily because, in imposing sentence, Judge Buckalew considered the reaction of members of the Gerrish family to the deaths of Scott and Wesley Gerrish.

However, *Sandvik* did not, as Clemans contends, expressly hold that evidence concerning the effects of a homicide on family members is irrelevant and should be disregarded by sentencing courts. The precise issue in *Sandvik* was whether "the lengthy remarks of the presentence report *concerning the character and background of the victim* are so highly inflammatory as to render them inherently prejudicial ...." *Sandvik*, 564 P.2d at 23–24 (emphasis added). The court in *Sandvik* broadly concluded that "portions of 'The Victim' segment of the presentence report ... were unreasonably detailed, emotional, and not particularly relevant." *Id.* at 24. This holding must, we believe, be read in context with the specific issue raised in that case: whether detailed information concerning the victim of a homicide was improperly submitted to the court.

The distinction between background information concerning a victim and information concerning the impact of the victim's death on immediate relatives is a significant one. Detailed and emotional information concerning the background of a homicide victim is largely irrelevant to the sentencing process. Under the law, the value

---

on two recent drunk driving manslaughter cases in which Judge Buckalew had imposed relatively moderate sentences. Both cases involved aggravating circumstances that arguably were not present in Clemans' case. Thus, it is manifest that Clemans might have hoped to convince Judge Buckalew that an even more lenient sentence was called for in his case. In fact, Clemans' trial counsel made precisely this argument. The record reflects that Clemans' trial counsel had actually obtained and was familiar with the transcript of at least one of the two prior sentencing proceedings, even though counsel had not participated in that case.

**6.** It should be noted that an overall comparison of the presentence report in this case to the

presentence report in *Sandvik* would probably be inappropriate. In addition to the claim of unduly emotional victim information, *Sandvik* involved a claim that the presentence report, in its entirety, was slanted against the defendant and failed to include any information favorable to the defendant. *Sandvik*, 564 P.2d at 26–27. Here, the presentence report is exhaustive, not only in dealing with the effects of the offense on the victim's family, but also in describing Clemans' background and the effects of the offense on his own life. Thus, although the "victim" sections of the presentence reports in this case and *Sandvik* may be comparable, the report in the present case is, on the whole, a thorough and well-balanced presentation of sentencing information.

of a human life does not increase or decrease according to a person's station in life or his achievements; the life of one human being cannot be deemed inherently more worthy of protection than the life of another. The tenor of the presentence report in *Sandvik*, however, strongly implied that the victim in that case was a particularly worthy person and that the defendant was therefore particularly deserving of punishment. Although the court's holding in *Sandvik* is somewhat ambiguous, we believe that it is this facet of the presentence report that the court found to be irrelevant and unduly emotional.

■ Nothing in *Sandvik* indicates that the effect of a person's death on family members is an improper sentencing consideration. Nor is it otherwise clear that such evidence is irrelevant. Sentences must be based on a realistic assessment of the seriousness of the individual offense. For this reason, it is of paramount importance that sentencing courts be provided with all relevant evidence and information concerning the offense and the offender. *Elson v. State*, 659 P.2d 1195, 1202 (Alaska 1983); *Nukapigak v. State*, 576 P.2d 982, 984 (Alaska 1978). To disregard the practical consequences that a homicide might have on members of a victim's family would be wholly unrealistic. As the *Sandvik* court expressly found, this is precisely the type of sentencing information that cannot "be effectively hidden or concealed ...." *Sandvik*, 564 P.2d at 24.

Moreover, unlike the impermissible notion that some victims of homicide are inherently more worthy than others, consideration of the impact of a homicide on members of the victim's immediate family can furnish a sound and realistic measure of the seriousness of the harm occasioned by the particular offense. To be sure, in homicide cases, the primary harm will always be the unlawful taking of a human life, and the sentencing court's attention

must focus on this harm. Homicides will always rank among the most serious of criminal offenses, regardless of what the practical consequences for persons other than the victim might be in any given case. This is not to say, however, that the immediate effects of such a crime must or should be disregarded for sentencing purposes.

■ We believe that, in evaluating the seriousness of a homicide, sentencing judges may properly consider the impact of the crime on members of the victim's immediate family. As with the myriad of other factors that may be considered by the court in evaluating the seriousness of an offense, undue emphasis should not be given to evidence concerning the effect of the crime on family members. The emotional impact of such evidence should not be exploited in order to inflame the sentencing court or to convert a sentencing hearing into an emotional exercise in vindictiveness. Yet neither should sentencing become an antiseptic process, in which the consequences of a criminal act are artificially removed from the court's view.

■ In the present case, we agree with Clemans' contention that Judge Buckalew considered evidence concerning the effect of Scott and Wesley Gerrish's deaths upon their family. The record does not, however, support an inference that Judge Buckalew misconstrued or misapplied the sentencing evidence. Judge Buckalew's remarks do not indicate that he increased Clemans' sentence based on the impermissible view that Scott and Wesley Gerrish were particularly worthy people and that their deaths thus called for enhanced punishment. And though Judge Buckalew's view of the seriousness of the offense was unquestionably influenced by the challenged evidence, his sentencing remarks do not indicate that he was unduly swayed by the emotional nature of that evidence.[7]

---

7. Nor does the length of the sentence actually imposed by Judge Buckalew provide cause for suspicion that the judge was unduly swayed by the emotional character of the evidence. The term of eight years with two years suspended that Judge Buckalew imposed is certainly not unusually high for manslaughter. *See Gibbs v. State*, 676 P.2d 606 (Alaska App.1984) (affirming

Rather, the record shows that the sentence Judge Buckalew imposed was the result of a careful effort to apply the appropriate sentencing criteria to the totality of the record.

In short, the record demonstrates that evidence of the impact that the deaths of Scott and Wesley Gerrish had on members of their family was considered by Judge Buckalew as part of the totality of the sentencing record in determining the seriousness of the offense. This evidence was not considered in a manner that was impermissible under *Sandvik*. As in *Sandvik*, portions of the presentence report and of the sentencing testimony in this case were unnecessarily detailed and unduly emotional.[8] However, we hold that the presence of such evidence in the sentencing record did not result in plain error.

### B. *Sentencing Court's Discussion of Appropriate Sentencing Criteria*

■ Clemans next claims that, in imposing sentence, Judge Buckalew did not adequately address all the appropriate sentencing criteria. *See State v. Chaney*, 477 P.2d 441, 443–44 (Alaska 1970). *See also* AS 12.55.005. However, a review of the record indicates that Judge Buckalew accepted Clemans' contention that a sentence of incarceration was not necessary to rehabilitate or deter him. Given this finding, it was obviously unnecessary for the judge to mention expressly that isolation of Clemans was not necessary for the protection of society. Judge Buckalew did make it abundantly clear that the sentence he imposed was based on the need to deter other offenders and to affirm societal norms.

Thus, Judge Buckalew adequately covered all the applicable sentencing criteria in explaining his sentence.

■ Clemans' real complaint seems to be that the court gave inordinate priority to deterrence of others and reaffirmation of societal norms, and not enough priority to rehabilitation. Yet the sentencing court must assume primary responsibility for determining the priority to be given to the various sentencing criteria, and rehabilitation need not be accorded paramount significance. *Ahwinona v. State*, 598 P.2d 73, 75–76 (Alaska 1979); *Griffith v. State*, 578 P.2d 578, 582 (Alaska 1978); *Asitonia v. State*, 508 P.2d 1023, 1026 (Alaska 1973); *Nicholas v. State*, 477 P.2d 447, 449 (Alaska 1970). Here, given the nature and seriousness of Clemans' offense, we cannot say that Judge Buckalew improperly emphasized deterrence of others and reaffirmation of societal norms.

### EXCESSIVENESS OF SENTENCE

■ Clemans' final contention is that his sentence is excessive. Clemans stresses his lack of any prior criminal record, his willingness to accept responsibility for his conduct, and his commitment to aid others who have the potential to commit the same type of offense. Clemans urges that he would be a far greater resource in the fight against drunken driving if he were given a substantially shorter sentence of imprisonment and required to devote more time to community service instead.

Both the supreme court and this court have consistently underscored the seriousness of homicides committed by drunken

---

a sentence of ten years with five years suspended for a first offender convicted of drunken driving manslaughter).

**8.** Although the presentence report in this case, when considered in its entirety, may provide a more balanced presentation of relevant sentencing information than the presentence report in *Sandvik*, we nevertheless think it is important to stress that the challenged portions of Clemans' report are highly similar to those portions of the *Sandvik* report that were disapproved by the Alaska Supreme Court. In this case, as in *Sandvik*, the challenged portions of the presentence

report included irrelevant and unnecessarily detailed information concerning the victims; much of this information was presented in an unduly emotional manner. We wish to emphasize that presentence reports should provide the sentencing court with an overview of relevant sentencing information that is both reliable and objective. Had Clemans made a timely objection to the presentence report, we think the sentencing court would certainly have had ample justification to order preparation of an amended presentence report.

drivers. In such cases, we have repeatedly held that deterrence of others and reaffirmation of societal norms should be given a prominent role in sentencing. *Rosendahl v. State*, 591 P.2d 538, 540 (Alaska 1979); *Sandvik v. State*, 564 P.2d at 25–26; *Godwin v. State*, 554 P.2d 453, 455 (Alaska 1976); *Layland v. State*, 549 P.2d 1182, 1184 (Alaska 1976), *overruled on other grounds, Anchorage v. Geber*, 592 P.2d 1187 (Alaska 1979); *Gibbs v. State*, 676 P.2d 606, 608 (Alaska App., February 17, 1984); *State v. Lamebull*, 653 P.2d 1060, 1062 (Alaska App.1982); *State v. Lupro*, 630 P.2d 18, 21 (Alaska App.1981).

This case is unusual because of Clemans' favorable background, the responsible manner in which he reacted to his offense, and his willingness and ability to perform valuable community service. As Clemans points out, no other appellate decision has approved a sentence as lengthy as his in the absence of a prior record of drunken driving offenses or other comparable aggravating factors.

However, no other appellate decision has held a comparable sentence to be excessive for an offense of this magnitude. The maximum penalty for manslaughter is twenty years, and, under the sentencing structure applicable at the time of his offense, Clemans would have been subject to a presumptive sentence of ten years if he had previously been convicted of one felony. The sentence Clemans received is thus well below the presumptive sentence for a second offender in his class. *See Austin v. State*, 627 P.2d 657, 658 (Alaska App.1981) (sentences for first felony convictions under the Revised Criminal Code should normally not exceed the presumptive sentence for a second offense). Moreover, Clemans was convicted of manslaughter as a result of an episode involving the death of two people.

Furthermore, it cannot fairly be said that this offense involves marginal conduct, either in terms of intoxication or recklessness. At the time of the offense, Clemans was severely intoxicated and obviously impaired. As emphasized by Judge Bucka-

lew, Clemans' driving was extremely reckless. Judge Buckalew characterized the case as a "classic" case of drunken driving manslaughter. We think that this characterization of the offense is accurate.

Through criminal sentencing, Alaska's courts must decisively and unequivocally express society's disapproval of the needless killing of innocent victims by the reckless acts of drunken drivers. Neither an offender's favorable background nor his willingness to accept responsibility after the fact provides just cause to disregard the tragic seriousness of such crimes. If the criminal justice system is to reduce the alarming frequency of drunken driving manslaughters, clear and consistent notice must be served that the conduct involved in such cases will not be tolerated by the law. This is exactly what Judge Buckalew sought to do in imposing Clemans' sentence. Both as an expression of community condemnation and as a deterrent to other potential offenders, the sentence imposed by Judge Buckalew was not clearly mistaken. *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

The sentence is AFFIRMED.