**Wilfred RAPHAEL, Petitioner,**

v.

**STATE of Alaska, Respondent.**

No. S–8645.

Supreme Court of Alaska.

Jan. 7, 2000.

Rehearing Denied Feb. 3, 2000.

James T. LaVecchia, Kenai, for Petitioner.

Kenneth M. Rosenstein, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Respondent.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

FABE, Justice.

## I. INTRODUCTION

The prosecutor in Wilfred Raphael's assault and kidnapping trial told the trial judge at an ex parte hearing that the complaining witness, I.W., was likely to recant, was intoxicated, and should be incarcerated until she testified. Without first notifying Raphael or his attorney of the prosecutor's claims, the trial judge granted the prosecutor's request, jailing I.W. and placing her children in protective custody. Raphael claims that the trial court denied his right to due process because of the potentially coercive effect of I.W.'s treatment on her testimony and his right to be present at the hearing. We agree and thus reverse Raphael's conviction and remand for a new trial.

## II. FACTS AND PROCEEDINGS

Wilfred Raphael was indicted in November 1994 on charges of kidnapping and assaulting the woman with whom he lived, I.W. His trial began on August 28, 1995 and proceeded through the beginning of September. I.W. had testified before the grand jury, and the state subpoenaed her to testify at trial in Bethel. The prosecutor picked up I.W. from the Bethel airport and arranged for her and her two children to stay at a local shelter, Pacifica House, pending her testimony. The prosecutor instructed I.W. to remain sober and to restrict herself to Pacifica House during the trial.

On September 5, 1995, during a recess in trial due to the defense attorney's illness, the prosecutor appeared before the trial judge, Superior Court Judge Dale O. Curda, outside the presence of Raphael and his attorney, to discuss I.W.'s testimony. Arguing that I.W. was "a victim who teeters between recanting one week and testifying about what happened the next" and apparently concerned that I.W. might not be sober to testify over the next two days, the prosecutor complained that he was unable to "control" I.W. The prosecutor claimed that he "got a call from Pacifica House" stating that I.W. had been evicted for being intoxicated and that I.W. was "out in the foyer and [ ] still intoxicated." The prosecutor did not call I.W. or any other witness to support these factual claims. He suggested several possible solutions to the trial court, including incarceration of I.W.

Without first notifying defense counsel of the problem, the trial court decided to incarcerate I.W. and place her children in protective custody until she testified. The trial court then summoned I.W. into the courtroom, questioned her briefly about her alleged drinking and her children, and informed her of its decision. I.W. insisted that she was not intoxicated and pleaded with the court not to take her children away. Notwithstanding her pleas, the court jailed I.W. and told I.W. that it would revisit the custody issue after her testimony:

So I'm going to order that you be remanded into custody on the case, no bail, and you're—she's not to have any contact with the defendant in this case. And she's going to be—once the testimony is done, then we'll revisit it. And she gives testimony and we'll revisit the case, and presumably let her—she'll be able to be released.

When the trial recommenced two days later, Raphael's attorney, James Gould, asked the trial court about the "status of the children and [I.W.]." In its brief description of the content of its conversation with I.W., the trial court did not inform Gould of the hearing, the court's placement of I.W.'s children in protective custody, the court's directive to I.W. not to have contact with Raphael, or the court's statement to I.W. that it would "revisit" the custody issue after her testimony. Gould did not make any objection at this point, nor did he object later to I.W.'s testimony. I.W. remained in jail for three days, awaiting her turn to testify. Moreover, the trial judge did not immediately release I.W. after she testified. Although the court permitted her to sit in the courtroom, I.W. remained in custody until the defense closed its case. In her testimony, I.W. described Raphael's conduct before, during, and after the alleged assault in a manner that comported with her earlier inculpatory testimony before the grand jury.

Raphael appealed his conviction to the court of appeals, arguing both that the ex parte hearing violated his right to be present at all trial proceedings under Alaska Criminal Rule 38(a) and that the treatment of I.W. violated his federal due process right to a fair trial. The court of appeals concluded that because the trial court did not inquire into the substance of I.W.'s intended testimony at

the ex parte hearing, Raphael's presence at that hearing was not critical and, thus, the hearing did not run afoul of Rule 38(a). The court of appeals also reasoned that the trial court's and State's comments to I.W. could not have impermissibly influenced her to testify in a certain way. Finally, the court of appeals decided that the trial court's actions did not constitute plain error because Gould's failure to object could have been a tactical decision based on a prediction that I.W. would be angry with the State for suggesting her incarceration.

Raphael petitioned for hearing of the court of appeals's decision, and we granted his petition.

## III. DISCUSSION

### A. The Trial Court's and State's Treatment of I.W. Violated Raphael's Right to Due Process.[1]

1. The ex parte hearing's coercive effect on I.W.'s testimony violated Raphael's right to due process.

■■■■ Raphael maintains that, by summarily incarcerating I.W. and taking away her children, the trial court and the State coerced I.W. into testifying against Raphael, thus violating Raphael's right to due process.

■■■■ Statements that are "the product of coercion may be unreliable and untrustworthy, and thus should be excluded as evidence against one not coerced into making them."[2] Although a trial court may use its subpoena power to force a witness to testify,[3] coercion and intimidation of witnesses by the State is improper.[4] This rule applies to witnesses for the State as well as the defense.[5]

---

1. Whether a trial court has violated a defendant's right to due process is a legal question to which we apply our independent judgment. See Lashbrook v. Lashbrook, 957 P.2d 326, 328 (Alaska 1998).

2. Dimmick v. State, 473 P.2d 616, 619–20 (Alaska 1970).

3. See Alaska R.Crim. P. 17(a).

4. See id.; Tucker v. State, 721 P.2d 639, 642 (Alaska App.1986).

5. See also Williams v. Calderon, 48 F.Supp.2d 979, 1000–01 (C.D.Cal.1998) (holding that the defendant had a cognizable habeas claim based on physical abuse of a government witness); Bradford v. Johnson, 354 F.Supp. 1331, 1336–38 (E.D.Mich.1972) (holding that the police's torturing of a witness until he provided in-court testimony incriminating the defendant violated the defendant's right to due process); cf. J & L Diversified Enters. v. Municipality of Anchorage, 736 P.2d 349, 352 (Alaska 1987) (noting that a prosecutor's coercion of a witness would violate a defendant's rights but would not give rise to tort liability under 42 U.S.C. § 1983).

The State labels Raphael's coercion argument "a desperate effort to parlay the violation of [I.W.]'s due process rights into a violation of his own." But we believe that Raphael has properly asserted that the State's treatment of I.W. violated his own right to due process. More specifically, both our case law and that of other jurisdictions uniformly recognize a defendant's ability to assert a due process violation based on the coercion of witnesses whose statements are used against the defendant at trial.[6] Thus, even if I.W.'s treatment at the hands of the trial court and the prosecutor did not in and of itself affect Raphael's rights, the subsequent use of her testimony against Raphael, if coerced, would violate Raphael's due process.[7]

To determine whether I.W.'s testimony was coerced, we use the same standard that we apply to confessions of the accused: Statements or testimony are not voluntary if they are obtained by threat or by a direct or implied promise that is sufficiently compelling to overbear an individual's will in light of all surrounding circumstances.[8] "[M]ethods offensive when used against an accused do not magically become any less so when exerted against a witness."[9] Both mental and physical coercion are improper tools to elicit testimony; the "blood of the accused [or witness] is not the only hallmark of an unconstitutional inquisition."[10] In the end, we consider the totality of the circumstances surrounding a witness's testimony to determine the coercive effect of the trial court's and prosecutor's conduct.[11]

Based on a review of the circumstances surrounding I.W.'s in-court testimony, we believe that the actions and statements of the trial court were coercive. We agree with Raphael that the trial court's near-total denial of I.W.'s due process rights sent the message that she "was at the mercy of the power of the State" and that I.W. thus did not feel free to testify unfavorably to the State.

The ex parte hearing in this case involved, in the words of Judge Mannheimer, "a remarkable deprivation of due process":[12]

> Without notifying [I.W.] that her liberty was in jeopardy, and without giving [I.W.] an opportunity to be heard, or even an opportunity to attend the discussion, the prosecutor and the judge decided to imprison [I.W.] and temporarily hand her children over to [DFYS]....
>
> ....
>
> Except for the fact that the [hearing] was ... made a part of the public record[,] ... it might rival the infamous proceedings held in the English Court of the Star Chamber. "The essence of star chamber procedure is that the litigants learn of the matter in issue and the judgment thereon only after the judgment against them is rendered." That is what happened to

---

**6.** *See, e.g., United States v. Gonzales,* 164 F.3d 1285, 1289 (10th Cir.1999); *LaFrance v. Bohlinger,* 499 F.2d 29, 34 (1st Cir.1974) ("Due process does not permit one to be convicted upon his own coerced confession. It should not allow him to be convicted upon a confession wrung from another by coercion.") (quoting *Malinski v. New York,* 324 U.S. 401, 430–31, 65 S.Ct. 781, 89 L.Ed. 1029 (Rutledge, J., dissenting)); *McMillian v. Johnson,* 878 F.Supp. 1473, 1512–14 (M.D.Ala. 1995), *rev'd in part on other grounds,* 88 F.3d 1554 (11th Cir.1996); *Tucker,* 721 P.2d at 642.

**7.** *See, e.g., Webb v. Texas,* 409 U.S. 95, 98, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (holding that a trial judge's action in singling out a defense witness for a lengthy admonition on the dangers of perjury "effectively drove that witness off the stand, and thus deprived the defendant of due process of law under the Fourteenth Amendment").

**8.** *See Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976) (declaring that a statement "obtained by any direct or implied promises, however slight," is not voluntary); *United States v. Leon Guerrero,* 847 F.2d 1363, 1366 (9th Cir.1988) (same).

**9.** *Gonzales,* 164 F.3d at 1289 n. 1 (citation omitted).

**10.** *Blackburn v. Alabama,* 361 U.S. 199, 206, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960).

**11.** *See Arizona v. Fulminante,* 499 U.S. 279, 285–88, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

**12.** *Raphael v. State,* Mem. Op. & J. No. 3799 at 18, 1998 WL 191159 (Alaska App., April 22, 1998) (Mannheimer, J., concurring).

**[I.W.]**[13]

The trial court denied I.W. nearly all of the basic fundamental protections that a defendant in a civil contempt proceeding must receive to comport with due process, including the right to counsel and the potential right to a jury trial.[14] I.W. had no friend or advisor present to tell her what the State could or could not do to her.

The State contends that the trial court did not discuss the substance of I.W.'s testimony in her presence and, thus, that she could not have believed that she had to testify in a certain way to avoid further incarceration. But after summoning I.W. into the courtroom to inform her that she would be incarcerated, the trial judge conveyed the strong impression that I.W.'s release from imprisonment was conditioned not only on *whether* she testified, but on *how* she testified as well:

The Court:  All right. Well, I'm going to find, based on the—I'm going to find that Ms. [W.] is in contempt here regarding this, and I'm going to have her remanded. She's going to be kept in custody.....

I.W.:  No. I don't.....

The Court:  ....pending testimony in the above case. That's the only viable solution I see here for her protection and for the kids' protection and to have her.....

I.W.:  I can take care of my kids.

The Court:  .... provide testimony here.
....

The Court:  ... As soon as we're done with the case, I hope you'll be able to get home and get your kids and.....

I.W.:  I can remain sober.

The Court:  Well.....

I.W.:  Please don't take my kids away from me.

The Court:  .... you haven't shown you can. I mean, the short time you were here, you knew you were supposed to.....

I.W.:  I had a babysitter.

The Court:  ....remain sober.

I.W.:  I was—I didn't get intoxicated, I had a babysitter.

The Court:  Okay. You were told you should remain sober.... And I apologize, Ms. [W.], I don't like to do this to anybody, especially someone with two kids that came into town. But you are under subpoena, you had notice of this, you knew you were supposed to stay sober and you didn't. So I'm going to order that you be remanded into custody on the case, no bail, and you're—*she's not to have any contact with the defendant in this case. And she's going to be—once the testimony is done, then we'll revisit it. And she gives testimony and we'll revisit the case, and presumably let her—she'll be able to be released.*

(Emphasis added.) If the trial court conditioned I.W.'s imprisonment solely on her agreement to testify, no need for the trial court to "revisit" any issue would exist; I.W. would no longer be in contempt and would be released following her testimony. I.W. could have interpreted the trial judge's statement that he "hope[d]" [I.W.] would be "able to get home and get [her] kids" after trial as a veiled threat to keep her in jail if her testimony was not pleasing to the court or the State.

■ Even where a witness has flatly refused to testify, a trial court should condition imprisonment solely on the witness's continued refusal to testify; once the witness testifies, the witness is no longer in contempt of court and the justification for incarceration disappears.[15] In this way, a defendant in a civil contempt proceeding "carries the key to her freedom in her own pocket."[16] Here, I.W. did not refuse to testify. And even though they were concerned that her intoxication could impede her ability to testify, by threatening continued incarceration and by flagrantly ignoring the requirements of due process, the trial court and the State implied that they held the only key to I.W.'s freedom and that her sobriety and ability to testify would be insufficient to regain that freedom.

---

13.  *Id.* at 18–20 (quoting *Morris v. United States,* 156 F.2d 525, 532 (9th Cir.1946) (Denman, J., dissenting)).

14.  *See Otton v. Zaborac,* 525 P.2d 537, 539 (Alaska 1974) (holding that due process encompasses the right to counsel in a civil contempt proceeding); *Johansen v. State,* 491 P.2d 759, 762–67 (Alaska 1971) (holding that a civil contempt defendant has a right to a jury trial when the act of contempt was not committed in the presence of the court and when the incarceration is in part punitive).

15.  *Cf. E.L.L. v. State,* 572 P.2d 786, 789 (Alaska 1977) (noting that the witness's continued imprisonment was "conditioned solely on her refusal to testify").

16.  *Id.*

Taken in the context of its other remarks to I.W., the trial court's directive that I.W. was "not to have any contact with the defendant in this case" also could have indicated to her that it expected her to testify favorably for the State. The trial court did not explain its justification for imposing the no-contact order on I.W. Indeed, the source of the court's authority to enter such an order is unclear.

The psychological effect of taking away I.W.'s children without a proper custody hearing was, most likely, even more coercive than I.W.'s own incarceration.[17] In *Lynumn v. Illinois*,[18] the United States Supreme Court held that a defendant's confession was involuntary where the police made several threats to her as to the consequences of her refusal to cooperate.[19] The Court took special note of the police's threat to cut off "state financial aid for her infant children" and take her children away.[20] Here, the trial court not only removed I.W.'s children but also did not guarantee the children's return upon the completion of I.W.'s testimony.[21] I.W.'s testimony was thus involuntary on this basis as well.

Our holding in this case does not mean that all testimony by witnesses incarcerated in civil contempt proceedings is involuntary. Incarceration is a necessary remedial tool in a judge's arsenal when attempting to secure a recalcitrant witness's testimony. But in this case I.W. voluntarily appeared in Bethel and had not violated any court order. And when a witness can reasonably interpret a trial court's decision to imprison her as an attempt to influence the *substance* of her testimony, as the record indicates was the case here, the risk that the witness may not testify freely and truthfully is too great. As a criminal defendant, Raphael has a constitutional right under the Due Process Clause not to bear that risk.

2. *The due process violation was not harmless beyond a reasonable doubt.*

A constitutional error is a ground for reversal of conviction unless the error is "harmless beyond a reasonable doubt."[22] To determine whether coerced testimony was harmless, we must "quantitatively assess[ ] [the testimony] in the context of other evidence presented in order to determine [its effect on the trial]."[23] The State claims briefly that Raphael's attorney's ability to cross-examine I.W. concerning the ex parte hearing cured any coercive effect on her testimony. We disagree.

The State's argument assumes that Raphael's attorney had access to all relevant information about the trial court's treatment of I.W. for purposes of cross-examination. In fact, when Raphael's attorney asked the trial court about why I.W. had been incarcerated, the court related an abbreviated account of what had happened at the ex parte hearing:

Mr. Gould: What is the status of the children and [I.W.], what's going on with that?

The Court: I talked to [I.W.] yesterday, [and] she was intoxicated. She had been here less than 24 hours. I had held her in contempt and had her remanded pending her testimony in

---

17. *See, e.g., United States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir.1991) (discussing the "improper influence" that law enforcement officers exert when they "prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit 'cooperation' ").

18. 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963).

19. *See id.* at 530–34, 83 S.Ct. 917.

20. *Id.* at 534, 83 S.Ct. 917.

21. The Arizona case that the State attempts to analogize to this one, *State v. Jones*, 188 Ariz. 534, 937 P.2d 1182 (App.1996), is inapposite. The trial court jailed the witnesses in *Jones* only

after they failed to honor their subpoenas and released them after they testified. *See id.* at 1194. Unlike Raphael, the defendant in *Jones* presented no evidence that the violation of the witnesses' due process rights affected their testimony. *See id.* at 1194–95.

22. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), *partially overruled by Brecht v. Abrahamson*, 507 U.S. 619, 622, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (holding that "harmless beyond a reasonable doubt" analysis not applicable in habeas cases).

23. *Brecht v. Abrahamson*, 507 U.S. at 629, 113 S.Ct. 1710 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 307–08, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)).

this case, because I couldn't—there was no place else she could go and stay sober. And I told her I regretfully did that, and I apologized to her, but I didn't feel like the court had any choice on that.

(Whispered conversation)

The Court: So as soon as she testifies, she's going to get out of jail.

Mr. Gould: Thank you.

This cursory description did not inform Gould of the existence of a hearing or a transcript, the no-contact order, or the trial court's statement that it would "revisit" the child custody and imprisonment issues after I.W. testified. Gould could have reasonably inferred from the trial court's comments that the hearing had been merely a chance encounter between the trial court and a witness. Thus, his ability to cross-examine I.W. effectively regarding bias was limited at best.

Moreover, I.W.'s testimony was central to the State's case against Raphael. Although the State called several witnesses other than I.W., their testimony consisted of after-the-fact details such as descriptions of I.W.'s physical condition after the alleged assault and I.W.'s location within Raphael's house when troopers arrived. Only I.W. testified about Raphael's behavior before, during, and after the alleged assault. Thus, this case is not one in which coerced testimony is harmless because of its cumulative nature.[24]

Because we conclude that the trial court's and prosecutor's treatment of I.W. had a coercive effect on her testimony that was not harmless beyond a reasonable doubt, we hold that the trial court's violation of Raphael's due process was reversible error.

---

**24.** See, e.g., United States v. Shyllon, 10 F.3d 1, 4 (D.C.Cir.1993); Tucker v. State, 721 P.2d 639, 642–43 (Alaska App.1986).

**25.** Whether a defendant has a right to be present during a particular proceeding is a question of law to which we apply our independent judgment. See State v. Shewfelt, 948 P.2d 470, 471, 473 (Alaska 1997).

**26.** 559 P.2d 1059 (Alaska 1977).

**27.** Id. at 1063.

**28.** Id. (quoting Lewis v. United States, 146 U.S. 370, 372, 13 S.Ct. 136, 36 L.Ed. 1011 (1892)).

**B.** *The Trial Court Committed Reversible Error by Conducting the Hearing Concerning I.W.'s Testimony Outside Raphael's Presence.*[25]

**1.** *The ex parte hearing violated Raphael's right to be present under Criminal Rule 38(a).*

As we stated in State v. Hannagan,[26] "[t]he right of an accused to be present at stages of trial has long been recognized in this country."[27] Generally, after indictment, "nothing [should] be done in the absence of the prisoner."[28] In Alaska, a defendant's right to be present stems from the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as well as analogous clauses in the Alaska state constitution.[29]

We have implemented this constitutional right as a procedural requirement through the adoption of Alaska Criminal Rule 38(a), which provides:

> *Presence: Required.* The defendant shall be present at the arraignment, at the preliminary hearing, at the time of plea, at the omnibus hearing, and at every stage of the trial, including the impaneling of the jury and return of the verdict, and at the imposition of sentence, except as otherwise provided in this rule.

The Alaska Court of Appeals has recognized that the right to be present under Alaska Criminal Rule 38(a) is broader than the right arising from the federal constitutional guarantees of confrontation and due process.[30]

We have interpreted the language of Rule 38(a) literally to secure a defendant's right to

---

**29.** See Alaska Const. art. I, §§ 7, 11.

**30.** See Henry v. State, 861 P.2d 582, 593 (Alaska App.1993). Because we conclude that the ex parte hearing violated Raphael's right to be present under Rule 38(a), we need not address whether it also violated Raphael's federal constitutional right to be present. Thus, the State's discussion on State v. Hamons, 248 Kan. 51, 805 P.2d 6 (1991), and State v. Douglas, 234 Kan. 605, 675 P.2d 358 (1984), two Kansas Supreme Court cases discussing the scope of the right of presence under federal and Kansas law, is irrelevant to our Rule 38(a) analysis.

be present even at stages of the trial that are arguably not substantive in nature. For example, in *State v. Hannagan*,[31] we held that Rule 38(a) guarantees a defendant's right to be present when testimony is played back to the jury, even though no evidence is taken and nothing is litigated at jury play-backs.[32] Similarly, in *Dolchok v. State*,[33] we held that the protections of Rule 38(a) extended to a pre-trial conference at which the parties discussed only purely legal and procedural matters.[34] This expansive scope of protection reflects the fact that the defendant's presence at all stages of the trial—whether or not a particular proceeding has a direct bearing on the defendant's guilt or innocence—promotes the perception and reality of fairness in the trial process.[35]

Another of our right-of-presence cases, *Brown v. State*,[36] is particularly instructive because of its similarity to this case. In *Brown*, the defendant claimed that the trial court violated Rule 38(a) by denying him the right to be present at a hearing to determine whether his fiancé would invoke the spousal privilege to avoid testifying on his behalf.[37] We held that the trial court violated Brown's right to be present, notwithstanding the fact that the hearing was a witness-related proceeding that could have been held before trial:

> The state argues that the hearing was not a "stage of the trial" within the meaning of rule 38—that the hearing could have occurred prior to trial. This is possible, but not likely in the usual course of proceedings where subpoenaed witnesses report to the court. However, all we are concerned with here is that the hearing was in fact held during a stage of the trial reserved for the presentation of evidence for the defense; that the defendant himself did

not waive his right to be present; that he was in custody and not voluntarily absent; and that his case may have been prejudiced, in that if he had been present his wife might not have invoked her privilege.[38]

Here, although the ex parte hearing could have theoretically occurred before trial, it occurred during the State's presentation of its case and was thus a "stage of the trial."

The State argues that *Brown* is inapposite because the hearing in that case concerned the testimony of a defense witness and the defendant clearly had an interest in attending the hearing. It posits that, in this case, "[t]he only interest Raphael could have asserted at the hearing was his interest in enabling [I.W.] to make herself unavailable for trial, either through intoxication or through absconding."

This argument ignores Raphael's legitimate interest in making sure that I.W. was not pressured into testifying favorably for the State. Immediately after lamenting that he could not "control" I.W., the prosecutor offered incarceration and placement of her children with DFYS as a solution. He then expressed his concern about I.W. recanting:

> [S]he's having a very difficult time summoning up the courage to come in and testify against her husband.... I think everybody at this point is aware that a couple months ago, she went to the Public Defender Agency and fed them a statement to try to get Mr. Raphael out of jail. So this is a victim who teeters between recanting one week and testifying about what happened the next. And I know the court's familiar with that situation.

**31.** 559 P.2d 1059 (Alaska 1977).

**32.** *See id.* at 1063–64. Although we found constitutional error, we ultimately affirmed the defendant's conviction because we concluded that the error was harmless beyond a reasonable doubt. *See id.* at 1065–66.

**33.** 639 P.2d 277 (Alaska 1982).

**34.** *See id.* at 283–85. As in *Hannagan,* we ultimately found the error in *Dolchok* to be harmless beyond a reasonable doubt. *See id.* at 285.

**35.** *See Lee v. Illinois,* 476 U.S. 530, 540, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986).

**36.** 372 P.2d 785 (Alaska 1962).

**37.** *See id.* at 787–88.

**38.** *Id.* at 790.

If a defendant's right to be present is to hold any meaning whatsoever, it must extend to proceedings in which the trial court imprisons a witness who has not violated any court order, bars the witness from contacting the defendant, and offers to "revisit" the issue of the witness's release from imprisonment after she testifies. This is especially true where the testimony is of a critical state witness who has previously expressed a desire to recant.

This result does not affect a trial court's authority to conduct emergency ex parte hearings to secure the presence of a witness. The subpoena power would mean little if divorced from the enforcement mechanism of emergency contempt proceedings.[39] But this authority does not extend to shutting the defendant out of a proceeding such as the one conducted in this case.

2. *The trial court's violation of Raphael's right to be present under Rule 38(a) was not harmless beyond a reasonable doubt.*

A violation of a defendant's right to be present is reversible error unless it is harmless beyond a reasonable doubt.[40] We have "found reversible error in situations where the defendant's presence could have had an impact on the decisional process."[41] The State argues that, regardless of whether the ex parte hearing would have been different with the addition of Raphael and his attorney, a change in the outcome of the proceeding would not have affected the trial verdict or Raphael's ability to mount a defense. We disagree.

The presence of Raphael and his attorney would undoubtedly have profoundly changed the nature of the ex parte hearing. First, they could have demanded proof of I.W.'s intoxication beyond mere assertions from the prosecution unsupported by testimony or affidavit such as a breathalyzer or other objective measure of intoxication.

Second, Gould could have called I.W. as a witness and asked her questions about the prosecutor's directives to her and about what happened at Pacifica House. Although the trial court did ask I.W. several questions, it did so only briefly, dismissed her answers, and did not allow her to explain fully the circumstances surrounding her leaving Pacifica House. In fact, when the prosecutor asked the trial court during the hearing whether he should bring I.W. into the courtroom, the judge replied, "[y]eah[,] but I—I've never found that ... talking to someone, especially when they're under the influence, is going to make any difference ... whatsoever on their behavior."

Third, Gould might have questioned the propriety of preemptively incarcerating I.W. for allegedly violating not a court order but merely a prosecutor's admonition to stay sober. As Judge Mannheimer noted in his concurrence to the court of appeals's decision, "a person [cannot] be held in contempt of court for violating the directives of an attorney, even the directives of an assistant district attorney. There is no indication in the record that [the trial judge] himself had ordered [I.W.] to remain sober pending her appearance at Raphael's trial."[42]

Fourth, Raphael and Gould could have argued for alternatives to incarceration. The

**39.** *See, e.g., International Union, United Mine Workers of America v. Bagwell,* 512 U.S. 821, 827 n. 2, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) (holding that, when the contempt is committed in the presence of the court, the court may dispense with usual due process requirements and immediately and summarily adjudge the case); *United States v. Neal,* 101 F.3d 993, 997 (4th Cir.1996) (allowing trial courts to dispense with notice and hearing requirements and other formalities in contempt cases "where immediate punishment is essential to prevent demoralization of the court's authority before the public") (citation omitted).

**40.** *See State v. Hannagan,* 559 P.2d 1059, 1065 (Alaska 1977). This standard, which we adopted in accord with the United States Supreme Court's decision in *Chapman v. California,* 386 U.S. 18, 23–24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), supplanted the requirement we had set forth in *Noffke v. State,* 422 P.2d 102 (Alaska 1967), that an error must affect a substantial right of the defendant to be prejudicial. *See id.* at 105.

**41.** *Hannagan,* 559 P.2d at 1065–66 n. 20.

**42.** *Raphael v. State,* Mem. Op. & J. No. 3799 at 21, 1998 WL 191159 (Alaska App., April 22, 1998) (Mannheimer, J., concurring).

prosecutor suggested three options at the hearing: incarceration of I.W. and placement of her children with DFYS, sending I.W. home, or keeping I.W. in Bethel by way of house arrest or by placing her in another shelter. The prosecutor then claimed that a shelter might not be viable because I.W. probably would not be willing to stay there and might not be able to commit to sobriety. The court agreed and gave I.W. very little chance to make the case for an alternative to incarceration:

Mr. Wrona:  Ms. [W.], is there . . . somewhere you can go somehow where you're going to stay sober and take care of your kids until we can get your testimony at trial? . . .

I.W.:  Oh, I—I checked out of Pacifica before check-out time. And I—well, I—I went—went over there before—before check-out time. And I—I got a room over at Kusko Inn.

Mr. Wrona:  That's not going to. . . . .

The Court:  No. That—that's not. . . . .

I.W.:  I have a room there.

The Court:  Yeah, well, I believe you but that's not going to work because the Kusko Inn is just not a good place.

I.W.:  Well, I could get a refund and—if I have to, and if you want to, I can stay at TWC.

Mr. Wrona:  Ms. [W.], to stay there—and you know, the rules.

I.W.:  Yeah.

Mr. Wrona:  And I know that's not your favorite place. But. . . . .

. . . .

Mr. Wrona:  . . . .you've got to stay sober. . . . [I]f you don't and there's even a glimmer of a problem, you're going to get thrown in jail and your kids will get taken away from you. We're here today to try and explore ways to not do that to you.

. . . .

The Court:  Well, Ms. [W.], you've been here less than 24 hours, you got the two kids with you and you couldn't stay sober for those less than 24 hours.

I.W.:  And I wasn't—I wasn't intoxicated.

The Court:  Okay. Well, even now, you're slightly under the influence . . . . I mean you're not staggering drunk but you're slightly under the influence. Not only am I concerned about your testimony in this case, whenever we can get it done, but I'm also concerned about the kids.

. . . .

The Court:  All right. Well, I'm going to find, based on the—I'm going to find that [I.W.] is in contempt here regarding this, and I'm going to have her re-

manded. She's going to be kept in custody. . . . .

. . . .

The Court:  . . . .pending testimony in the above case. That's the only viable solution I see here for her protection and for the kids' protection and to have her. . . . .

. . . .

The Court:  . . . .provide testimony here.

I.W.:  Just put us in TWC, okay?

The Court:  Well, they're not going to take anybody who's under the influence or is not going to follow their rules.

Incarceration of I.W. was thus not the trial court's only option. Had Raphael and his attorney been present at the hearing, they could have argued for the trial judge to explore other options more fully or could have taken exception to the trial court's refusal to do so.

Fifth, Raphael could have argued that the trial court's reasons for placing I.W.'s children in custody were improper. When the trial judge explained to I.W. why he was taking her children away, he justified his decision in part on her alleged drinking problem and not merely on the fact that she would be in temporary custody: "[I.W.], it's not just about you being sober for this case. I mean you need to be sober for your kids to keep your kids safe, whatever happens with the case, and also to keep yourself safe."

Finally, Raphael and Gould could have stopped the trial court from barring I.W. from contacting Raphael and could have objected to the trial judge's remark that the trial court and the State would "revisit" the issues of the children and of I.W.'s own imprisonment after she testified.

Because the trial court's and State's remarks to I.W. at the hearing had a potentially coercive effect on her testimony and that testimony was critical to the State's case against Raphael, the hearing was actually highly relevant to the outcome of the trial. By being present at the hearing, Raphael and his attorney could have objected to the potentially coercive conduct and could have requested that the trial judge emphasize to I.W. that her release was not dependent on how she testified. We therefore cannot say that the Rule 38(a) violation was harmless beyond a reasonable doubt.

C. *Because the Trial Court Committed Plain Error, Raphael's Failure to Object to the Ex Parte Hearing or to I.W.'s Testimony Does Not Preclude His Appeal.*[43]

The State argues that Raphael abandoned his right to appeal his absence from the ex parte hearing and the hearing's coercive effect on I.W.'s testimony because Raphael's attorney failed to object to these errors during trial. Although we agree that Raphael's attorney did not make a timely objection to these errors, we believe the trial court committed plain error and, thus, we nevertheless recognize Raphael's constitutional claims.

Alaska Criminal Rule 47(b) allows appellate courts to notice "[p]lain errors or defects affecting substantial rights ... although they were not brought to the attention of the [trial] court." Because Raphael's attorney did not make an objection at the time the trial court informed him of its contact with I.W. and did not object to I.W.'s subsequent testimony, we look to see whether the trial court committed plain error.

We have interpreted the phrase "plain error" to mean an error that is both obvious and substantially prejudicial.[44] Plain error involves such egregious conduct as to "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice."[45]

We believe this case does involve such egregious conduct on the part of the trial court and the State. As we stated in *Burford v. State*,[46] denial of a defendant's constitutional rights, "in the normal case, would ... give rise to plain error."[47] In *Burford,* we linked the existence of plain error to the question of whether the constitutional error was harmless beyond a reasonable doubt.[48] Here, the trial court's violations of Raphael's right to due process and right to be present at the ex parte hearing were not harmless. Moreover, to condone such an "untrammeled exercise of coercive power"[49] as occurred in this case by allowing the use of I.W.'s testimony to convict Raphael would "contribute to a miscarriage of justice" that is unacceptable in a civilized modern court system.[50]

The State argues in the alternative that, even if the trial court's errors were obvious and substantially prejudicial, the fact that Raphael's failure to object could have been a tactical decision precludes a finding of plain error. Specifically, the State contends that Raphael could have hoped that I.W.'s incarceration would make her hostile toward the prosecution and cause her to slant her testimony in his favor.

But this argument assumes that Raphael's attorney had a sufficiently accurate view of the scope of the error and deliberately chose to waive any objection. In *Noffke v. State*,[51] we held that, although defense counsel had failed to object to an instruction given to the

---

**43.** Whether a defendant has abandoned or forfeited an appellate claim by failing to make a timely objection in the trial court is a question of law that we review de novo. *See Graybill v. State*, 522 P.2d 539, 541 (Alaska 1974) (treating the matter of whether the defendant forfeited an appealable issue as a question of law).

**44.** *See Massey v. State*, 771 P.2d 448, 453 (Alaska App.1989) (defining plain error as one that is both obvious and substantially prejudicial); *Kugzruk v. State*, 436 P.2d 962, 964 (Alaska 1968) (defining plain error as error that is "obviously prejudicial") (citation omitted).

**45.** *United States v. Young*, 470 U.S. 1, 16, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), *quoted with approval in Potts v. State*, 712 P.2d 385, 390 (Alaska App.1986). The standard for "plain error" under Alaska Criminal Rule 47(b) is in accord with the standard under its identical federal counterpart, Federal Rule of Criminal Procedure

52(b). The United States Supreme Court in *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), held that Rule 52(b) requires that the error be obvious and affect substantial rights, which in most cases means that it must be prejudicial. *See id.* at 734, 113 S.Ct. 1770.

**46.** 515 P.2d 382 (Alaska 1973).

**47.** *Id.* at 383.

**48.** *See id.*

**49.** *Raphael v. State*, Mem. Op. & J. No. 3799 at 26–27, 1998 WL 191159 (Alaska App., April 22, 1998) (Mannheimer, J., concurring).

**50.** *Young*, 470 U.S. at 16, 105 S.Ct. 1038.

**51.** 422 P.2d 102 (Alaska 1967).

jury during its deliberations and outside the defendant's presence, we would reach the issue on appeal because there was "nothing *in the record* to show that [the defendant's] trial counsel had any knowledge ... of the fact that the trial judge had given the jury this supplemental instruction." [52] Here, although specifically invited to do so,[53] the State has presented no evidence from the record that Raphael's attorney knew of the nature of the ex parte hearing and yet deliberately chose not to object. To the contrary, the record shows that the trial court did not fully inform Raphael's attorney of the nature or content of the hearing.

Based on the trial court's abridged account to Raphael's attorney of its contact with I.W., along with the lack of support for the theory that Gould knew the full extent of the constitutional errors and deliberately chose not to object, we cannot say that Raphael's failure to object to the ex parte hearing and to I.W.'s testimony was tactical. Because the trial court committed plain error, we recognize Raphael's constitutional claims on appeal.

## IV. *CONCLUSION*

Because we conclude that the trial court committed reversible error by denying both Raphael's right to due process and his right to be present under Criminal Rule 38(a), and because these violations were plain errors allowing us to review them despite Raphael's failure to object, we REVERSE Raphael's conviction and REMAND for a new trial.

EASTAUGH, Justice, with whom CARPENETI, Justice, joins, dissenting.

This court holds that the superior court erred. As a remedy, it reverses Raphael's conviction and remands for a new trial. I disagree with that result, and therefore dissent. Although the superior court's acts cannot be condoned, I would not reverse out-

right, but remand to determine whether Raphael's attorney's failure to object was a tactical decision.

The proper result turns on our analysis of the plain error doctrine. Raphael's trial attorney did not object to the procedure the superior court followed in jailing I.W. The state argues here, as it did before the court of appeals, that Raphael's failure to object could have been a tactical decision precluding a finding of plain error. The state theorizes that Raphael could have hoped that I.W.'s incarceration would make her hostile to the prosecution and cause her to slant her testimony in Raphael's favor.

The court of appeals unanimously agreed that there was no plain error. That court wrote:

> One element of plain error is that the defendant must show that there was no apparent tactical reason to withhold an objection. *See Potts v. State,* 712 P.2d 385, 394 n. 11 (Alaska App.1985). Here, the record reveals a reasonable possibility that Raphael's attorney withheld objection for tactical reasons. The defense attorney might reasonably have anticipated that [I.W.], if she remained in jail until she testified, might be feeling substantial antagonism toward the state by the time she took the stand at Raphael's trial, and that consequently [I.W.] would slant her testimony against the state to retaliate for her perceived ill-treatment. In other words, Raphael had a plausible tactical reason for letting [I.W.] languish in jail for as long as possible. This being so, Raphael cannot claim plain error now.[1]

This court rejects the state's argument because, the court reasons, nothing in the record shows that Raphael's attorney knew of the nature of the ex parte hearing.[2] The court notes that the state did not demonstrate, although asked by us to do so, that

**52.** *Id.* at 106–07 (emphasis added).

**53.** On May 5, 1999, we requested that both parties submit supplemental briefing as to whether the record contained any evidence, aside from the trial court's abbreviated description of the hearing discussed above, of Gould's knowledge of the ex parte hearing and the surrounding

circumstances. Neither party found any such references.

**1.** *Raphael v. State,* Mem. Op. & J. No. 3799 at 11–12, 1998 WL 191159 (Alaska App., April 22, 1998).

**2.** *See* Slip Op. at 28.

the record contained any evidence that the defense attorney "knew of the nature of the ex parte hearing and yet deliberately chose not to object. To the contrary, the record shows that the trial court did not fully inform Raphael's attorney of the nature or content of the hearing." [3]

Certainly the superior court did not fully reveal to defense counsel what had occurred. But what the superior court did reveal should have set off alarms for experienced defense counsel, inevitably triggering further inquiry. Counsel could have asked the court to elaborate, requested a brief recess, listened to the tape recording of the ex parte proceeding, or asked the prosecutor to explain what had happened. That counsel made no inquiry on the record permits a reasonable inference that defense counsel already knew enough to think that I.W.'s incarceration might provide Raphael a tactical advantage that would be lost if Raphael moved for a mistrial or sought some other remedy.[4]

Of course, that is not the only permissible explanation for counsel's silence. Possibly counsel was just not alert to the potential implications of the superior court's inadequate explanation. But I read the explanation, despite its patent inadequacy, to be the sort that would provoke prompt inquiry from experienced and capable defense counsel. That there was none on the record makes a tactical choice more probable.

The record in this case does not resolve this question.[5] Its silence is consistent with both possibilities. If counsel made a deliberate choice, it is unlikely he would have memorialized the full extent of his knowledge on the record. I think substantial knowledge is most consistent with counsel's and the record's silence. If there was a deliberate tactical choice, the failure to preserve a claim of error is fatal to Raphael's appeal.[6] The court of appeals gives three policy reasons for this rule: (1) a defendant should not be permitted to switch his tactics after an unfavorable outcome, (2) a tactical decision not to object by defense counsel is an indication that prejudice to the defendant is unlikely, and (3) the lack of an objection precludes the trial court from taking measures to correct the error.[7]

Therefore, in my view the better course is to remand to establish a record in this case about what defense counsel knew. That will permit a reasoned determination about whether there was a deliberate choice, and therefore, whether there was plain error which we may review. The court's remedy, reversal of the conviction and remand for new trial, is premature.

My view regarding the appropriate relief on remand in part reflects Raphael's efforts to set aside his conviction. In oral argument to this court, his appellate attorney revealed that Raphael has applied for post-conviction

**3.** *See id.*

**4.** Even before the court told defense counsel that it had incarcerated I.W., defense counsel asked the court the following question: "What is the status of the children and [I.W.], what's going on with that?" The prosecutor had also told the court that he had spoken with defense counsel about I.W.'s daughter's placement with DFYS. This suggests that defense counsel may have already learned at least something about I.W.'s incarceration before trial resumed that day. The state did not call I.W. to testify until the next day. After defense counsel finished cross-examining I.W., the prosecutor asked the court to "keep her under ice until this afternoon" because she might be needed for rebuttal. The superior court agreed. Defense counsel again raised no objection.

**5.** That does not mean the facts have not been preserved. As I note below, they may already

have been preserved in Raphael's post-conviction relief proceeding.

**6.** *See Henry v. State,* 861 P.2d 582, 589 (Alaska App.1993) (stating court would not find plain error when there appeared to be tactical reason to withhold objection); *Robison v. State,* 763 P.2d 1357, 1358 (Alaska App.1988) (noting that strategic reasons for foregoing remedy precluded finding of plain error or ineffective counsel); *Potts v. State,* 712 P.2d 385, 394 n. 11 (Alaska App.1985) (noting that finding of plain error is virtually equivalent to finding of ineffective counsel: one will rarely exist absent the other, and rarely will either be found if counsel's actions were tactical); *Barry v. State,* 675 P.2d 1292, 1295 (Alaska App.1984) (stating that plain error is rarely found where counsel may have had strategic reasons for conduct).

**7.** *See Clemans v. State,* 680 P.2d 1179, 1186 (Alaska App.1984).

relief,[8] and that a deposition had been or would be taken from Raphael's trial attorney to support Raphael's claim of ineffective assistance of counsel. I am not suggesting that Raphael's only remedy for I.W.'s incarceration lies in an ineffective assistance claim for post-conviction relief. But because the critical facts—what defense counsel knew and was told—have been or will be revealed in the record of another superior court proceeding, our reversal today is premature and may be proved to have been wrong. Indeed, the dispositive facts may already have been pre-served. And if they have not, delay in determining facts can be avoided by requiring that the remand and post-conviction relief proceedings be consolidated and by imposing strict deadlines for taking counsel's deposition.

---

**8.** *See* Alaska R.Crim. P. 35.1.