NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter.*</u> *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

CHARLES AKELKOK,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-12843
Trial Court No. 3DI-16-00125 CR

O P I N I O N

No. 2681 — October 9, 2020

Appeal from the Superior Court, Third Judicial District, Dillingham, Michael R. Spaan, Judge.

Appearances: Megan R. Webb, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. Donald Soderstrom, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Harbison, Judges.

Judge WOLLENBERG.

Following a jury trial, Charles Akelkok was convicted of third-degree assault for attacking his daughter, Alicia Akelkok, after she and Annie Sergie —

Akelkok's then-girlfriend — found Akelkok in bed with another woman.[1]  Akelkok now appeals his conviction, arguing that the trial court coerced Sergie's testimony in violation of his right to due process.

For the reasons explained in this opinion, we reject Akelkok's claim, and we affirm his conviction.

*Underlying facts and proceedings*

On June 2, 2016, a group of people, including Charles Akelkok and his daughter, Alicia Akelkok, were drinking in Thresa Askoak's apartment in Dillingham. Annie Sergie (Akelkok's girlfriend) was drinking in another apartment nearby.

At some point, Alicia brought Sergie to Askoak's apartment.  Alicia wanted to show Sergie that Akelkok was cheating on her.  After walking through the apartment to the bedroom, Alicia and Sergie found Akelkok in bed with Askoak.

When Alicia confronted her father from the bedroom doorway, Akelkok jumped out of bed and pushed Alicia into the living room, and Alicia fell backward. Akelkok climbed on top of Alicia and punched her in the face several times before putting his hand near her throat.

Sergie's son, Jessie Sergie, lived in the apartment above Askoak's and heard his mother yell his name.  Jessie went downstairs to Askoak's apartment and saw Akelkok on top of Alicia with his hand near her neck.  Jessie pulled Akelkok off of Alicia, and Akelkok ran back into the bedroom and jumped out the window.

When the police arrived, they searched for Akelkok behind the apartment building and found him lying on the ground a short distance away.  Akelkok had a "tiny bloody nose" and blood around his mouth.  He was also intoxicated.  He had slurred

---

[1]  AS 11.41.220(a)(5).

speech, red watery eyes, and a "poor, unsteady, and swaying balance"; he also smelled of alcohol.

Alicia had swelling and bruises on her face and some marks "where the neck meets [the] collarbone area."

A grand jury indicted Akelkok on two counts of assault — one count of second-degree assault (for intending to cause physical injury to Alicia by strangulation) and one count of third-degree assault (for recklessly causing physical injury to Alicia — *i.e.*, committing a fourth-degree assault — having twice been previously convicted of similar offenses within the preceding ten years).[2]

Akelkok's case proceeded to a jury trial. Several witnesses testified: Thresa Askoak, Annie Sergie, Alicia Akelkok, Jessie Sergie, Alicia Akelkok's mother, and the responding police officer.

The jury acquitted Akelkok of second-degree assault. But the jury found Akelkok guilty of fourth-degree assault, and in a bifurcated portion of the proceeding, found that Akelkok had two prior qualifying convictions. Accordingly, Akelkok was convicted of third-degree recidivist assault.

*The facts surrounding Sergie's testimony*

The central question in this appeal is whether the trial court's actions had a coercive effect on Annie Sergie's testimony and therefore violated Akelkok's right to due process. Accordingly, we will describe the background facts regarding Sergie's testimony in some detail.

Following Akelkok's arrest, the State initially charged Akelkok with assaulting Sergie. However, the State decided not to pursue this charge after Sergie

_____

[2] AS 11.41.210(a)(1) and AS 11.41.220(a)(5), respectively.

failed to appear at the grand jury proceeding. Based on her failure to appear at the grand jury proceeding, the court issued a warrant for Sergie's arrest. At a subsequent hearing, the court quashed the warrant at the prosecutor's request but admonished Sergie that she needed to appear at grand jury proceedings if subpoenaed.

The State later subpoenaed Sergie as a witness for Akelkok's trial. On the first day of trial, before jury selection, the prosecutor announced that a colleague had seen Sergie at court that morning and reported that Sergie was under the influence. The prosecutor advised the judge that Sergie was supposed to return to court later in the day and asked the judge to admonish Sergie that she needed to be sober when she appeared in court the next day to testify in Akelkok's case. The trial court replied, "[I]f she shows up tomorrow when she's supposed to testify and she's wobbling around, these guys [Judicial Services] have a Breathalyzer; if she's drunk, we'll take her away."

The next day, before jury selection was completed, the prosecutor informed the court that Sergie had failed to appear. In open court, in the presence of both Akelkok and his attorney, the prosecutor asked the court to issue a civil bench warrant for Sergie. The prosecutor stated that she had spoken the previous evening with Renee Roque, Alicia Akelkok's mother, and Roque reported that Sergie did not intend to return to court under subpoena. The prosecutor left Sergie "a couple of messages" instructing her to report to court under her subpoena, and warning her that if she failed to appear, the prosecutor would request a warrant.

The judge issued the warrant but declared that he would not hold Sergie in jail once she was brought to court: "[W]hen she is found [and] brought before me . . . I will assure that she stays here; I'm not going to keep her in jail, but I do want her brought before the court."

Later that morning, the prosecutor informed the court that the police thought that they had found Sergie hiding in a home. The police were at the door of the home, trying to contact the homeowner so that they could enter.

The parties completed jury selection and proceeded with opening statements. The State presented its first witness, Thresa Askoak.

At about 2:38 p.m., Sergie was brought into court. The prosecutor stated that she wished to present Sergie's testimony next, but she first wanted to determine whether Sergie was under the influence.

Over the next twenty-two minutes, the parties debated whether Sergie could testify that day and, if not, how best to secure her testimony for the following day.

Outside the presence of the jury, Sergie admitted that she had been drinking, and a portable breath test indicated that she had a breath alcohol level of .248 percent. Because of her high breath alcohol level, the trial court told Sergie that she could not testify that day and would have to come back the next morning. The court warned Sergie that she needed to appear, and Sergie promised that she would show up the next morning, sober and ready to testify.

At that point, the prosecutor interjected and asked that Sergie be taken into custody. The prosecutor understood the court's reluctance to incarcerate Sergie. But the prosecutor stated that Sergie had already been admonished, following the grand jury proceeding, "on the importance of showing up under subpoena," and that the officers who tracked Sergie down that day were "confident that they w[ould] not be able to find her again."

According to the prosecutor, Sergie had "fled [Dillingham] to avoid service" at one point prior to trial and was staying in Anchorage with a family member. After the Anchorage police "got a lead," they found Sergie. Sergie returned to Dillingham, but she refused to tell the prosecution where she was living. The prosecutor

asserted that, in addition to telling Roque that she would not appear at trial that day, Sergie had also apparently posted on Facebook that she did not intend to testify.

In response, Akelkok's attorney argued that, under the Alaska Supreme Court's decision in *Raphael v. State*,[3] the court could not jail Sergie to ensure her appearance. The court agreed with defense counsel that *Raphael* applied and stated that it would not incarcerate Sergie. (As we explain later in the opinion, this broad interpretation of *Raphael* is incorrect; a court is not flatly prohibited from relying on incarceration as a "remedial tool" when attempting to secure a recalcitrant witness's testimony, so long as the witness is afforded due process and the court acts in a non-coercive manner.[4])

Because of the court's reluctance to jail Sergie, the court began to consider other options to help ensure Sergie's appearance the following day. The court attempted to obtain an address or phone number for Sergie, but Sergie was unable to provide a specific address, and she did not have a cell phone. The court asked the judicial service officers whether they had an electronic monitoring device that could be placed on Sergie, but they did not.

When Sergie promised to return the next morning, the court asked her how impaired she felt, noting that she had a high breath alcohol level. Sergie responded, "I'm good."

At that point, the prosecutor again interjected. The prosecutor informed the court that Sergie had "a bowl of heroin" when she was arrested by the police. Although the State had not yet filed a criminal charge, the prosecutor voiced her intention to do so.

---

[3]    *Raphael v. State*, 994 P.2d 1004 (Alaska 2000).

[4]    *Id.* at 1010; *see also In re Curda*, 49 P.3d 255, 258 & n.6 (Alaska 2002).

The court acknowledged that, due to a recent change in the law, possession of heroin was not a "jailable offense," but stated that it needed "some way to assure her appearance if she's charged."[5] The court therefore ordered that Sergie be taken into custody. Akelkok's attorney strongly objected to this procedure.

Sergie was taken into custody at approximately 2:48 p.m., about ten minutes after she first appeared.

However, just minutes later, the court — seemingly swayed by defense counsel's continued objections — changed its mind and asked a Judicial Services officer to bring Sergie back to the courtroom for a competency inquiry. The court engaged Sergie in a colloquy about her ability to testify and her willingness to tell the truth. Following the colloquy, the trial court found that Sergie was capable of communicating and understanding her duty to tell the truth and that she was competent to testify that day.

The jury returned to the courtroom at about 3:00 p.m., twenty-two minutes after the court first addressed Sergie. Akelkok's trial proceeded, and Sergie testified.

During Sergie's testimony, the court intervened several times to address Sergie's behavior — *e.g.*, to admonish Sergie not to curse or use foul language, to urge Sergie to provide audible responses, and to direct Sergie to answer the attorneys' questions.

---

[5] In 2016, the legislature reclassified the simple possession of heroin as a class A misdemeanor. *Compare* former AS 11.71.040(a)(3), (d) (2015) *with* AS 11.71.050(a)(4), (b) (post-July 2016); SLA 2016, ch. 36, § 47; *see also* AS 11.71.140(d)(11) (heroin is a Schedule 1A controlled substance). At the time of trial in this case, the law precluded a court from imposing an active term of imprisonment for this offense, unless the defendant had been previously convicted more than once for controlled substance misconduct. Former AS 12.55.135(n) (version effective July 2016); SLA 2016, ch. 36, §§ 93, 188. The legislature later repealed this portion of the sentencing statute. FSSLA 2019, ch. 4, § 138.

Sergie's testimony concluded after about a half hour, and the court released her.

*Why we conclude that the trial court did not unduly coerce Sergie's testimony*

On appeal, Akelkok argues that the trial court coerced Sergie's testimony, and thereby violated Akelkok's right to due process. Although we have some concerns about the manner in which the trial court proceeded, the totality of the circumstances does not show that the trial court's conduct had a coercive effect on the substance of Sergie's testimony.[6]

The seminal case on this issue is the Alaska Supreme Court's decision in *Raphael v. State*.[7] In *Raphael*, the prosecutor alleged in an *ex parte* hearing that the complaining witness, I.W., was intoxicated and expressed concern that she might not be sober to testify over the next couple of days.[8] Although neither the defense attorney nor I.W. was present when the prosecutor presented his concerns to the trial court, the court decided to incarcerate I.W. and place her children in protective custody pending her testimony. Only after the *ex parte* hearing did the trial court inform I.W. of its decision. Despite I.W.'s pleas not to take away her children, the court jailed her and told her that

---

[6] *See Raphael*, 994 P.2d at 1008 (recognizing that an appellate court must consider "the totality of the circumstances surrounding a witness's testimony" to determine the coercive effect of the trial court's conduct, if any, on the witness's testimony) (citing *Arizona v. Fulminante*, 499 U.S. 279, 285-88 (1991), and *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

[7] *Raphael v. State*, 994 P.2d 1004 (Alaska 2000).

[8] *Id.* at 1006.

it would "revisit" her custodial status once she testified.[9]  I.W. was in jail for three days before she testified.[10]

Based on the totality of the circumstances, the supreme court held that the trial court's actions — taken without notice to defense counsel or an opportunity for I.W. to be heard — constituted a "near-total denial" of I.W.'s due process rights.[11]  The court further held that the treatment of I.W. had a coercive effect on her testimony and that the use of this coerced testimony against Raphael at his trial violated his due process rights, requiring reversal of his convictions.[12]

In particular, the supreme court concluded that the trial court's exchange with I.W. — in which the court promised only to "revisit" I.W.'s custodial status once she testified and expressed "hope" that she would be "able to get home and get [her] kids" after trial — "conveyed the strong impression that [her] release from imprisonment was conditioned not only on *whether* she testified, but on *how* she testified as well[.]"[13] According to the supreme court, I.W. could have interpreted the court's statements as "a veiled threat to keep her in jail if her testimony was not pleasing to the court or the State."[14]

The supreme court specifically noted, however, that its holding should not be read to preclude courts from relying on incarceration as a "remedial tool . . . when

---

[9]  *Id.*

[10]  *Id.* at 1007.

[11]  *Id.* at 1008.

[12]  *Id.* at 1008-11.

[13]  *Id.* at 1009 (emphasis in original).

[14]  *Id.*

attempting to secure a recalcitrant witness's testimony."[15] The court further clarified that a trial court's use of coercive power against a recalcitrant witness does not invariably mean that the witness's later testimony should be deemed involuntary.[16]

But the supreme court noted that, in Raphael's case, I.W. had voluntarily traveled to Bethel for trial, apparently intending to honor her subpoena, and had not violated any court order.[17] Moreover, even if I.W. had flatly refused to testify, the trial court was authorized to condition her imprisonment solely on her continued refusal to testify — not impliedly on her refusal to testify a certain way.[18]

Akelkok analogizes his case to *Raphael*. Akelkok argues that, like the complaining witness in *Raphael*, Sergie was denied due process protections — such as notice, an opportunity to be heard, and the appointment of counsel — and that the trial court created a coercive atmosphere that affected Sergie's testimony. He argues that the trial court failed to properly explain to Sergie what was happening, and that, from Sergie's perspective, she had been taken into custody to procure favorable testimony for the State against Akelkok.

But the circumstances of this case are markedly different from the circumstances of *Raphael*.

As an initial matter, unlike I.W., Sergie had twice failed to appear under a subpoena in this case — once before the grand jury and again at trial. After Sergie failed to appear at the grand jury proceeding, she was admonished by the court about the

---

[15] *Id.* at 1010.

[16] *Id.*; *see also Fely v. State*, 2012 WL 1594208, at \*4 (Alaska App. May 2, 2012) (unpublished) (discussing *Raphael*, 994 P.2d at 1010).

[17] *Raphael*, 994 P.2d at 1010.

[18] *Id.* at 1009.

importance of honoring a subpoena. Despite this admonishment, Sergie again failed to appear at trial, after apparently indicating both to another witness and on Facebook that she did not intend to testify. In the presence of both parties, the court issued a warrant for Sergie when she failed to appear at trial, and Akelkok does not argue that the trial court erred in doing so.

Moreover, once Sergie was brought into court on the warrant, the court faced a difficult dilemma about how best to proceed. If Sergie had been sober, she would have simply testified immediately without any discussion of incarcerating her. But Sergie had a high breath alcohol content, and the court and both parties were understandably concerned about having Sergie testify that day.

At the same time, there were legitimate concerns as to whether Sergie would honor her subpoena for the following day if the court released her.[19] Sergie was either unable or unwilling to provide a valid address or phone number at which she could be contacted. And given the past difficulties in locating Sergie, the police expressed concern about being able to find her again.

Notwithstanding Sergie's prior failures to honor her subpoenas and the concern by the police and the prosecutor about being able to find Sergie if she were released, the court expressed great hesitation in incarcerating Sergie and instead explored other possibilities — all within the presence of both parties — for ensuring her appearance the following day. For instance, the court explored the possibility of placing an electronic monitor on Sergie as a less restrictive means of ensuring her compliance with the subpoena, but no monitor was available.

---

[19] *See Fely*, 2012 WL 1594208, at *6 (Unlike *Raphael*, "there was good reason to believe that the witness in question would refuse to honor the court's subpoena.").

We acknowledge that the court ordered Sergie to be briefly taken into custody after discovering that she had been found in possession of heroin. We do not condone the court's reliance on an unrelated non-jailable offense for which the State had not yet filed charges as a means of confining Sergie — an action that appears to have been precipitated, at least in part, by the trial court's mistakenly broad view of the limitations set out in *Raphael*. But the trial court reversed course just minutes later when persuaded to do so by defense counsel and summoned Sergie back into the courtroom.[20]

The court then engaged Sergie in a colloquy regarding her competency to testify — a colloquy that conveyed to Sergie the importance of telling the truth, and did not imply, as in *Raphael*, that Sergie was required to testify in a particular manner. Among other questions, the court asked Sergie if she knew the difference between the truth and a lie and whether she understood her duty to tell the truth while under oath. The court asked Sergie whether she would "be able to understand and respond as honestly as [she could] to the questions of counsel," and Sergie said, "Yes." The court ultimately determined that, despite her breath test result, Sergie was competent to testify that day.[21]

In short, the court's actions over the course of the twenty-two minutes between Sergie's arrival in court and the start of her testimony were geared primarily at ensuring either that Sergie would comply with her subpoena or that she was capable of

---

[20] Akelkok notes that Sergie did not have her own attorney to represent her. But even assuming that Sergie was entitled to the immediate appointment of an independent attorney during the brief period that the court was contemplating whether to release her, imprison her, or allow her to testify, *see Raphael*, 994 P.2d at 1009, there is no indication that this violation of Sergie's rights affected the substance of Sergie's testimony or rendered her testimony involuntary — thus implicating Akelkok's due process rights.

[21] Although Akelkok's trial attorney objected to Sergie testifying that day on the ground that she was intoxicated, Akelkok does not renew this challenge on appeal.

testifying that day — not that she testify a certain way. Indeed, we note that while Akelkok's attorney argued in the trial court that *imprisoning* Sergie would be coercive under *Raphael*, she never argued that the court actually coerced Sergie into testifying or influenced the substance of Sergie's testimony.

Akelkok argues that the trial court's repeated interjections during Sergie's subsequent testimony conveyed the impression that her freedom was linked to providing testimony favorable for the State. Akelkok specifically points to the fact that the trial court warned Sergie that she might have to return the next day, and he argues that this signaled to Sergie that "she was subject to the court's will and could remain incarcerated at least overnight, if not longer."

But our review of the record suggests that the court interjected primarily as a means of ensuring that the trial proceeded in an orderly and efficient manner, and that Sergie addressed the attorneys' questions.[22] The court only suggested that Sergie might have to return the following day when she continued to interrupt the defense attorney on cross-examination and would not let the attorney finish her questions before answering. (We note that Sergie expressed similar frustration with the prosecutor.)

For all these reasons, we conclude that, under the totality of the circumstances, the trial court did not coerce Sergie so as to affect the substance of her

---

[22] *See Pedersen v. State*, 420 P.2d 327, 337-38 (Alaska 1966) ("The trial judge is vested with wide discretion in controlling the order of proof, examination of witnesses, and the scope of cross-examination.").

testimony.[23] The trial court's conduct — and the introduction of Sergie's testimony — therefore did not violate Akelkok's right to due process.

*Why we remand Akelkok's case for correction of the presentence report*

In response to an objection by Akelkok's attorney prior to sentencing, the trial court agreed to delete certain information from the presentence report. The court stated that it had crossed out these matters and that they would not affect Akelkok's sentence. However, the presentence report contained in the record does not reflect these redactions.

Under Alaska Criminal Rule 32.1(f)(5), a trial court is obligated to fully delete any redactions to a defendant's presentence report and label the corrected copy as the "approved version" before delivering it to the Department of Corrections within seven days after sentencing. We therefore remand this case so that the trial court may obtain a corrected copy of Akelkok's presentence report that complies with its previous ruling and with Criminal Rule 32.1(f)(5).[24]

On appeal, the State argues that the trial court should amend, rather than redact, these portions of Akelkok's presentence report. But the State did not object to

---

[23]    *Raphael*, 994 P.2d at 1008 (providing that testimony is coerced or involuntary if it is "obtained by threat or by a direct or implied promise that is sufficiently compelling to overbear an individual's will in light of all the surrounding circumstances") (citing *Hutto v. Ross*, 429 U.S. 28, 30 (1976), and *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988)).

[24]    *See Christian v. State*, 276 P.3d 479, 483-84 (Alaska App. 2012); *Cragg v. State*, 957 P.2d 1365, 1368 (Alaska App. 1998).

the trial court's ruling at sentencing, and the State failed to file a cross appeal.  The State has therefore waived this claim.[25]

*Conclusion*

We direct the trial court to prepare and distribute a corrected presentence report in compliance with its prior ruling and with Alaska Criminal Rule 32.1(f)(5). With that exception, we AFFIRM the judgment of the superior court.

---

[25] *Peterson v. Ek*, 93 P.3d 458, 467 (Alaska 2004) ("We have consistently held that failure to file a cross-appeal waives the right to contest rulings below.").