2001 WY 102

**Brad SKINNER, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 00–100.

Supreme Court of Wyoming.

Oct. 30, 2001.

Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Tina Kerin, Assistant Appellate Counsel, for appellant.

Gay Woodhouse, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Kimberly A. Baker, Senior Assistant Attorney General; Theodore E. Lauer, Director of the Prosecution Assistance Program; and Carrie A. Kelly, Mia J. Mikesell, and Shawn Matlock, Student Interns, for appellee.

Before LEHMAN, C.J., and GOLDEN, HILL, KITE, and VOIGT, JJ.

KITE, Justice.

[¶ 1] This is an appeal from Brad Skinner's conviction of aggravated assault and battery in violation of Wyo. Stat. Ann. § 6–2–502(a)(iii) (LexisNexis 2001).[1] Mr. Skinner was sentenced to life in prison pursuant to Wyo. Stat. Ann. § 6–10–201 (LexisNexis 2001),[2] the habitual criminal law. He seeks review of his conviction based on six alleged errors committed during trial. Finding no reversible error, we affirm.

## ISSUES

[¶ 2] Mr. Skinner presents these issues for our review:

 I. Was Appellant prejudiced by the inclusion on the jury of a jury member who was deaf and who did not hear and understand all the proceedings in Appellant's Aggravated Assault trial?

---

1. Section 6–2–502(a)(iii) provides:
 (a) A person is guilty of aggravated assault and battery if he:
 . . .
 (iii) Threatens to use a drawn deadly weapon on another unless reasonably necessary in defense of his person, property or abode or to prevent serious bodily injury to another . . .

2. Section 6–10–201 provides:
 (a) A person is [a] habitual criminal if:
 (i) He is convicted of a violent felony; and
 (ii) He has been convicted of a felony on two (2) or more previous charges separately brought and tried which arose out of separate occurrences in this state or elsewhere.
 (b) [A] habitual criminal shall be punished by imprisonment for:
 (i) Not less than ten (10) years nor more than fifty (50) years, if he has two (2) previous convictions;
 (ii) Life, if he has three (3) or more previous convictions.

II. Did the trial court err in allowing a juror who had inappropriately conducted his own investigation to remain on the jury and was Appellant deprived of his constitutional right to trial by jury by the jury misconduct?

III. Did the trial court err in allowing the improper battered wom[a]n's syndrome testimony of Thad Davidson, and improper character evidence of Appellant?

IV. Was Appellant deprived of his right to be present at a critical stage of the proceedings by not being allowed to attend the hearing concerning the jury misconduct?

V. Did the state impermissibly coerce and threaten the alleged victim, resulting in unreliable testimony, and was the alleged victim given legal advice that forced her to testify untruthfully, in violation of Appellant's due process rights?

VI. Did the trial court err in not permitting evidence of the alleged victim's methamphetamine use and withdrawal?

The State of Wyoming rephrases the issues as:

I. Was [the juror], who wore a hearing aid, unable to hear material portions of the trial, thereby prejudicing Appellant?

II. Did the district court err by permitting [the juror] to remain on the jury after the juror contacted defense counsel in violation of the court's order?

III. Did the district court err in permitting Witness Thad Davidson to testify regarding attributes of battered or assaulted women?

IV. Was Appellant deprived of his right to be present at every critical stage of the proceedings when he was not present at the hearing in chambers regarding [the juror's] attempt to communicate with defense counsel?

V. Was Appellant's right to due process of law infringed by the actions of the state in inducing the victim, ... Appellant's wife, to testify against him?

VI. Did the district court abuse its discretion when it sustained the state's objection to questioning of the victim regarding her use of methamphetamine?

## FACTS

[¶ 3] This appeal involves a domestic violence dispute which occurred on March 3, 1999, when Mr. Skinner and his wife (the victim) went to The Lounge, a Casper bar. Earlier that evening, Mr. Skinner had consumed one beer, and the victim had consumed sufficient alcohol to become intoxicated. Mr. Skinner became aware the victim had some money in her possession, and he wanted to know where it came from, thus initiating an argument. He began to yell at his wife and asked her to return a hunting knife he had previously given her. She obliged, but the altercation continued. Eventually, the couple proceeded home with a stop at a drive-through window to purchase more alcohol.

[¶ 4] The victim testified that, once they arrived home, Mr. Skinner took hold of her hair and shirt and she slapped and hit him while yelling for help. Mr. Skinner proceeded to put his knee in her stomach and his hand over her mouth and nose. They continued fighting as they entered their home. The victim testified that, while Mr. Skinner turned around to close the door, she dialed 911 and laid down the telephone without her husband's knowledge. The dispatcher heard a male screaming and a female crying. The dispatcher could also hear the female being slapped, the female pleading for her assailant to stop, and the male threatening, "I'll kill you now." The dispatcher never heard a knife mentioned during the telephone call. The fighting continued and, according to the victim's testimony, Mr. Skinner threw her up against the wall, held her there, and head-butted her. The victim asked for her knife back, and Mr. Skinner took the knife out of his pocket with one hand while keeping the other hand on her neck.

[¶ 5] Soon thereafter, two police officers knocked on the door, and, when no one responded, they kicked in the door. Upon Mr. Skinner's arrest, an officer searched him and found a knife in his front pants pocket. While the officers were at the apartment, the victim told them that Mr. Skinner held the open knife to her throat. Subsequently, the

officers took a taped statement from the victim in which she restated her accusations.

[¶ 6] The victim testified that, while Mr. Skinner was released on bond, he asked her not to tell anybody that he had held a knife to her throat and not to tell the whole truth. The victim testified that, in a subsequent fight over the substance of her impending testimony, Mr. Skinner threatened to kill her, held a baseball bat to her neck, and punched her giving her a black eye.

[¶ 7] On direct examination, the victim stated that she could not remember whether or not Mr. Skinner had held the knife to her throat. During the victim's cross-examination, the trial judge appointed her independent counsel reasoning that was necessary because the cross-examination concerned whether she had made a false report to the police and whether she had been forced to lie or was afraid of going to jail as a result of her testimony. With the advice of independent counsel, the victim testified that Mr. Skinner had indeed placed a knife at her throat and threatened to kill her. Mr. Skinner never challenged the fact that the domestic altercation had occurred, but rather he insisted he never held a knife to the victim's throat.

[¶ 8] Mr. Skinner was charged with aggravated assault and battery in violation of § 6–2–502(a)(iii). At arraignment, he pleaded not guilty. Prior to trial, the victim had written a notarized letter to the trial judge disclaiming her allegations that Mr. Skinner threatened her with a knife. As a result, on July 29, 1999, the state filed a motion for detention of a material witness. The state argued the letter written by the victim indicated she was attempting to avoid service in order to refrain from testifying against her husband. The motion was granted, and the victim was arrested and incarcerated throughout Mr. Skinner's trial. Additionally, although the record is unclear as to the basis for the charge, the victim was charged with avoiding service of a subpoena pursuant to

Wyo. Stat. Ann. § 6–5–306 (LexisNexis 2001).

[¶ 9] On August 3, 1999, a jury found Mr. Skinner guilty of aggravated assault and battery. On October 6, 1999, the same jury found Mr. Skinner to be a habitual criminal due to his eight previous felony convictions, and the court sentenced him to a term of life in prison. Mr. Skinner appeals his conviction to this court.

## DISCUSSION

### A. Juror Misconduct

[¶ 10] Mr. Skinner contends he was deprived of his right to a fair and impartial jury due to improper juror conduct in the interim period between the initial trial and the habitual sentencing phase of the trial. After the verdict in the initial trial was announced, a juror contacted the court by letter and came into the defense counsel's office unannounced to personally inquire about a specific issue raised at trial—why the victim was forced to testify against her husband. The defense counsel briefly responded to the juror's inquiry and explained that he had tried to make it clear to the jury why the victim was arrested and forced to testify. The defense counsel immediately informed the trial court of the contact.

[¶ 11] The following morning, the trial court held proceedings in chambers in the presence of the juror, the prosecutor, and the defense counsel. The trial court appropriately admonished the juror and then sought and received assurance by the juror that he could be fair and base his decision regarding the habitual sentencing phase on only evidence produced in the courtroom. The trial court gave a cursory explanation to the juror that the victim was being held as a material witness and, in certain circumstances, a wife can be forced to testify against her husband.[3] However, the trial court made it clear that his explanation addressed an issue that had already been determined in the initial trial proceeding and should have no effect on the

---

**3.** We note that it appears from the record before us that the victim did not invoke a spousal privilege not to testify against her husband; consequently, the issue of whether one spouse may be

compelled to testify against another under these circumstances is not before us and is not herein addressed by this court.

habitual criminal proceeding. The state objected to the juror remaining on the juror panel, but the defense counsel did not. The trial court concluded the contact was harmless and overruled the state's objection.

 [¶ 12] The law is well settled that it is improper for a juror to have any out-of-court communications with witnesses, the court, parties, or counsel concerning a case. *Distad v. Cubin*, 633 P.2d 167, 182 (Wyo. 1981). Nor can a juror make any attempt to obtain additional evidence other than what is presented in the courtroom. *Id.*

> "There are many obvious reasons for not allowing jurors to supplement the knowledge of the subject-matter of investigation obtained in court from the evidence produced, by pursuing personal and private investigation out of the presence of the court, during the trial....This would not only be irregular, but it would necessarily result in permitting the inquiry by jurors to go beyond the control of the court and beyond the established rules of evidence, and into irrelevant and immaterial matters."

*McCoy v. Clegg*, 36 Wyo. 473, 257 P. 484, 498 (1927) (quoting *American Brake Shoe and Foundry Company v. Jankus*, 121 Ill.App. 267, 1905 WL 2095, at *3 (1905)).

 [¶ 13] In the instant case, once the trial court was informed of the improper juror contact, it promptly held a hearing. The trial court followed the appropriate procedure as set forth in *Sisneros v. City of Laramie*, 773 P.2d 933, 936 (Wyo.1989) (quoting *United States v. Hornung*, 848 F.2d 1040, 1045 (10th Cir.1988) (some citations omitted)):

> "When a trial court is apprised of the fact that extrinsic influence may have tainted the trial, the proper remedy is a hearing to determine the circumstances of the improper contact and the extent of the prejudice, if any, to the defendant. The court's questioning of a juror who is the recipient of extraneous information is limited to the circumstances and nature of the improper contact, as Fed.R.Evid. 606(b) precludes the court from delving into the subjective effect of the contact on the juror's decision-making. Accordingly, an objective

test should be applied in making an assessment of whether the defendant was prejudiced by the extraneous information. The court 'should assess the "possibility of prejudice" by reviewing the entire record, analyzing the substance of the extrinsic evidence and comparing it to that information of which the jurors were aware.' *United States v. Weiss*, 752 F.2d 777, 783 (2d Cir.), *cert. denied*, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985)."

Accordingly, a mere showing of improper communication is not sufficient; prejudice must also be shown. The record is clear that improper juror conduct occurred in this case; therefore, the analysis is focused on whether prejudice resulted.

██ [¶ 14] In *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), the United States Supreme Court stated:

> These cases demonstrate that due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

In the hearing conducted by the trial court, the juror stated that he could be fair and impartial and would base his decision solely on the evidence presented in the courtroom. Most importantly, the information the juror sought and received pertained to only the initial proceeding, which had been completely resolved. His inquiry into why the victim had been arrested and compelled to testify against her husband had absolutely no influence on the remaining habitual criminal proceeding wherein the only issue to be determined was whether Mr. Skinner had been convicted of previous felonies. Therefore,

Mr. Skinner could not have been prejudiced by the extraneous information the juror learned through his inquiries to the defense counsel and the trial court.

[¶ 15] Wyo. Stat. Ann. § 6–10–203(b) (LexisNexis 2001)[4] evidences the legislative intent that the same jury shall decide both the underlying charged felony and whether the defendant is a habitual criminal. The trial court followed the proper procedure and was assured of the lack of prejudice, a conclusion to which we defer. The trial court did not abuse its discretion in allowing the juror to remain empanelled during the habitual criminal proceeding.

## B. Hearing–Impaired Juror

■ [¶ 16] Mr. Skinner claims he was prejudiced because the same juror described above was hard of hearing and not certain he heard all the testimony and argument in the courtroom. "When seeking reversal based on the inability of a juror to hear evidence, a defendant must demonstrate prejudice, i.e., that the juror failed to hear material parts of the trial." *Sorensen v. State*, 6 P.3d 657, 661–62 (Wyo.2000), *cert. denied*, 531 U.S. 1093, 121 S.Ct. 818, 148 L.Ed.2d 702 (2001); *see also Belondon v. City of Casper*, 456 P.2d 238, 242 (Wyo.1969).

[¶ 17] Mr. Skinner relies on the letter to the trial judge following the first phase of the trial wherein the juror made the following statement, "I should mention here that [I] am slightly ancient (81) and my hearing is not good, so I might have missed some things in the courtroom." Principally, Mr. Skinner claims the juror made clear through his inquiries to the court and the defense counsel that he did not understand why the victim was in jail, which, according to Mr. Skinner, was a material part of the trial. Mr. Skinner argues the juror's failure to understand that the victim was testifying under threat of prosecution was material because it went directly to her credibility and was essential to his defense. However, on its face, this claim

challenges the level of understanding by the juror rather than his hearing impairment. The juror wanted to know why the victim was in jail and how a wife could be forced to testify against her husband indicating he had heard those facts at trial. The following responses demonstrate he heard the trial proceedings on this issue.

[THE JUROR]: Well, what made me think was there was a woman testifying against her husband. You were forcing her. No question in—in my mind, but you were forcing her to do it. She didn't want to do it, the way it looked to me. Is that right or wrong?

. . . .

[THE JUROR]: That's what it seemed to me. That's the reason I questioned it. That's the reason the whole thing has been in my mind, because I thought she was being forced to testify against her husband. And I didn't think that was legal.

These statements suggest the juror's informed understanding that the victim was forced to testify and only disclose his understanding of the law may not have been accurate.

■ [¶ 18] Based on the facts before us, we cannot conclude the juror's hearing was so impaired as to make him incapable of performing his duties as a juror. The juror admitted having a slight hearing problem during voir dire; however, the defense counsel did not make an objection for cause. Upon realizing the juror wore a hearing aid, the prosecutor asked him if he was able to hear most of what the victim had said, to which he replied, "[m]ost of it." If Mr. Skinner questioned the juror's ability to hear, he failed to object and cannot now rely on that reason as impeding his right to a fair trial. In addition, the voir dire examination reflects that the juror answered each question presented to him without apparent difficulty in hearing.

[THE PROSECUTOR]: What about the fact the victim in this case has been arrest-

---

4. Section 6–10–203(b) provides:

(b) The trial on the charged felony shall proceed as in other cases, but the jury shall not be informed of the previous convictions. If the defendant is convicted of the charged felony and does not plead guilty to the charge of the previous convictions, he shall be tried immediately by the same jury or judge on the charge of the previous convictions.

ed as a material witness and has been made to testify today? Would you hold that against the State?

[THE JUROR]: No.

. . . .

[THE PROSECUTOR]: And would you view the testimony of the victim differently than you would another person because of her situation?

. . . .

[THE JUROR]: No.

[THE PROSECUTOR]: Okay. Do each of you understand the reasons why the victim of domestic violence may not want to testify?

. . . .

[THE JUROR]: I suppose.

The record further reflects that, when the jury was polled by the defense at the conclusion of the case, the juror was again satisfactorily responsive. Absent a more definitive showing of prejudice due to the juror's inability to hear, we conclude there was no error.

## C. Defendant's Presence at Critical Stage of the Proceedings

[¶ 19] Next, Mr. Skinner argues he was deprived of his right to be present at a critical stage of the proceedings by not being allowed to attend the trial court's hearing concerning the juror misconduct described above. As previously explained, a juror was questioned as to his communications with the defense counsel after the verdict in the initial proceeding was announced but prior to the habitual criminal proceeding. Only the trial judge, the defense counsel, the prosecutor, and the juror were present for the hearing, and the defense counsel lodged no objection to the defendant's absence. "The question of whether a defendant had the right to be present at a specific phase of his trial is an issue of law and, as such, is subject to *de novo* review." *Seeley v. State*, 959 P.2d 170, 175 (Wyo.1998).

[¶ 20] The Sixth Amendment and the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution guarantee an accused the right to be present during every stage of the criminal proceeding that is critical to its out-

come if his presence would contribute to the fairness of the procedure. 959 P.2d at 177. Article 1, Section 10 of the Wyoming Constitution "is even more explicit in its guarantee to an accused of the right of presence at trial." *Maupin v. State*, 694 P.2d 720, 722 (Wyo.1985) ("In all criminal prosecutions the accused shall have the right to defend in person").

[¶ 21] "The right to be present at trial stems in part from the fact that by his physical presence the defendant can hear and see the proceedings, can be seen by the jury, and can participate in the presentation of his rights." *Bustamante v. Eyman*, 456 F.2d 269, 274 (9th Cir.1972); *see also Maupin*, 694 P.2d at 723. These constitutional guarantees are incorporated into Wyo. Stat. Ann. § 7–11–202 (LexisNexis 2001) and W.R.Cr.P. 43(a), which provide that a defendant shall be present "at every stage of the trial." *Seeley*, 959 P.2d at 177. "However, the due process right to be present is not unequivocal. The defendant's presence is not required when it 'would be useless, or the benefit but a shadow.'" *Id.* (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 106–07, 54 S.Ct. 330, 78 L.Ed. 674 (1934)).

[¶ 22] We have previously stated that constitutional error is not established when a defendant is absent during bench conferences on legal questions. *Sandy v. State*, 870 P.2d 352, 359 (Wyo.1994); W.R.Cr.P. 43(c)(3). However, even the state concedes in this case the issues addressed at the hearing were more than purely questions of law they were fact-finding inquiries into what communications occurred between the juror and the defense counsel. We cannot conclude the hearing was a "minor occurrence" which did not necessitate Mr. Skinner's presence. *See United States v. Gagnon*, 470 U.S. 522, 527, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (the United States Supreme Court held the absence of defendants during an inquiry into a juror's concern about one of the defendant's sketching jurors was a minor occurrence which did not violate the Fifth Amendment). The hearing discussed facts in controversy and law that was applicable to the initial phase of the case, and

the failure to allow Mr. Skinner to be present was error.

[¶ 23] As we stated in *Seeley*, the absence of a defendant during a conference with the court, even though of constitutional proportion, is subject to a harmless error analysis. 959 P.2d at 178.

> Before a federal constitutional error can be held harmless, the court must be able to declare its belief that the error was harmless beyond a reasonable doubt. In determining whether reversible error occurred, we ask if the defendant's absence created any reasonable possibility of prejudice. The State must show that an error can pass muster under this standard.

*Id.* (citations omitted). In light of the entire record, we are convinced Mr. Skinner's absence from the hearing was harmless beyond a reasonable doubt, as his absence from the hearing did not create any reasonable possibility of prejudice.

[¶ 24] Although he is not obligated to establish prejudice, Mr. Skinner insists prejudice resulted because he was not able to advise his counsel whether to ask questions of the juror, he could have asked his counsel to explain the proceedings and their significance, and he could have conferred with his counsel regarding what course of action should have been suggested to the court. Given the fact that this juror's questions indicated he was sympathetic to Mr. Skinner in that he did not believe the victim should have been forced to testify, it is unlikely Mr. Skinner's presence would have resulted in the defense counsel taking any different action than he did. Perhaps more importantly, the hearing at issue was conducted after the guilt phase of the trial and before the habitual criminal proceeding. Therefore, Mr. Skinner's absence did not create any reasonable possibility of prejudice. The narrow inquiry addressing the juror's confusion over an issue during the previous proceeding could not affect the juror's consideration of whether Mr. Skinner had been previously convicted of additional felonies the matter at issue in the final phase of the proceedings. We conclude the error was harmless beyond a reasonable doubt.

## D. Improper Battered–Woman–Syndrome Testimony

[¶ 25] In its case-in-chief, the state called an expert witness to testify regarding the battered woman syndrome. Mr. Skinner argues a portion of the testimony was inadmissible because the expert referenced patterns in domestic violence situations and how a batterer's anger and violence often escalates. Mr. Skinner complains this testimony implied to the jury that he had acted in conformity with the profile of a batterer and, in fact, held a knife to his wife's throat.

> Evidentiary rulings are within the sound discretion of the trial court and include determinations of the adequacy of foundation and relevancy, competency, materiality, and remoteness of the evidence. This court will generally accede to the trial court's determination of the admissibility of evidence unless that court clearly abused its discretion.

*Solis v. State*, 981 P.2d 34, 36 (Wyo.1999) (citation omitted); *see also Trujillo v. State*, 2 P.3d 567, 571 (Wyo.2000). We have described the standard of an abuse of discretion as reaching the question of the reasonableness of the trial court's choice. *Griswold v. State*, 2001 WY 14, ¶ 7, 17 P.3d 728, ¶ 7 (Wyo.2001). Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *Id.* "In the absence of an abuse of discretion, we will not disturb the trial court's determination." *Id.* The burden is on the defendant to establish such abuse. *Trujillo*, 2 P.3d at 571.

> If the trial court erred by admitting evidence, we then must ascertain whether the error affects any substantial rights of the accused, providing grounds for reversal, or whether it is harmless. The harmless error standard is set out in W.R.A.P. 9.04:
>
> > Any error, defect, irregularity or variance which does not affect substantial

rights shall be disregarded by the reviewing court.

*See also* W.R.Cr.P. 52. An error is harmful if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had never occurred. To demonstrate harmful error, the defendant must show prejudice under "circumstances which manifest inherent unfairness and injustice, or conduct which offends the public sense of fair play." *Johnson v. State*, 790 P.2d 231, 232 (Wyo.1990).

*Solis*, 981 P.2d at 36 (some citations omitted); *see also Ryan v. State*, 988 P.2d 46, 52–53 (Wyo.1999).

[¶ 26] In *Ryan*, this court addressed the propriety of allowing an expert to testify, under the scope of the battered woman syndrome, as to the characteristics of batterers and the type of conduct they tend to exhibit. In particular, the expert explained to the jury the concept of "separation violence," in which an escalation of violence occurs because perpetrators of domestic violence feel a loss of power and control over their partners when the partners are planning to leave or have left the relationship. 988 P.2d at 53. In *Ryan*, the expert then testified about the common characteristics of batterers. *Id.* The court recognized the expert did not specifically state that, because the defendant was violent, he acted in conformity therewith on the night of the murder; rather, the expert subtly and impliedly invited the jury to group the defendant among other batterers to determine his conduct. 988 P.2d at 55.

[¶ 27] Although battered-woman-syndrome testimony is admissible and helpful to the jury, it must not run afoul of W.R.E. 404(a) which provides in pertinent part: "Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion." When battered-woman-syndrome testimony is raised by the state in its case-in-chief and relates to a defendant, as it did in the instant case, the "testimony 'draws close to commenting directly on what likely happened' and 'looks like character evidence after all.'" *Ryan*, 988 P.2d at 55 (quoting Christopher B. Mueller & Laird C. Kirkpatrick, 3 Federal Evidence § 637 (2d ed.1994)). Evidence concerning a defendant's involvement demands close scrutiny under the character evidence rules. *Id.* "This is so even if reference to the defendant may only be inferred from the testimony." *Id.*

[¶ 28] The expert in the instant case testified as to the general characteristics and conduct of batterers, with particular focus on the tendency for violence to escalate over time. We discussed this concept in *Ryan* and stated:

Finding guilt by reference to common characteristics of a class of individuals to which one belongs raises the specter of profile evidence. Profile or syndrome evidence is developed through expert testimony and tends to classify people by their shared physical, emotional, or mental characteristics.... Translated into the battering spouse context, a profile is a compilation of characteristics repeatedly seen in those who batter their spouses.

*Id.* We continued:

While our research has not disclosed any case dealing specifically with battering spouses, other jurisdictions in different contexts have dealt with similar attempts to construct a criminal profile for the purpose of proving conduct in conformity therewith. Those jurisdictions that have considered profiles of battering parents, pedophiles, rapists, and drug couriers unanimously agree that the prosecution may not offer such evidence in its case-in-chief as substantive evidence of guilt. These cases generally articulate three evidentiary bases for excluding evidence tending to establish that the defendant fits a particular profile: 1) relevancy; 2) probative value substantially outweighed by prejudicial effect; and 3) impermissible character evidence.

*Id.* We recognized that, although profile evidence may be relevant, the danger of unfair prejudice has generally been found to outweigh the probative value, and the profile evidence is often an impermissible attack on the defendant's character. 988 P.2d at 56. Therefore, in *Ryan* we held the expert's tes-

timony regarding separation violence was inadmissible because it was introduced for the purpose of proving the defendant committed the act in contrast to his assertion that the victim committed suicide. *Id.*

[¶ 29] The expert in the instant case did not directly reference the particular character traits of Mr. Skinner. He did, however, explore the general cycle of violence, the shortened period of remorse, the escalation of violence, and the patterns of control. The use of profile testimony has been examined in the following way:

Strictly speaking, the data offered to create a social framework are not "character evidence," since they do not pertain to "*a person's* character or a trait of *his* character." Rather, the research describes the behavior of *groups* or *other* persons. Yet the purpose of offering character evidence is similar to the purpose of introducing social frameworks: to prove—that is, to make "more probable or less probable"— that an individual acted in conformity with an established pattern. By definition, knowledge of the general pattern of an individual's behavior (i.e., his or her character)—like knowledge of the general pattern of behavior in persons in the groups to which he or she belongs—allows one to recalculate the probabilities that the person acted in a certain way on a given occasion. The policy concern that gave rise to a rule barring the admissibility of evidence of an individual's "characteristic" behavior applies with equal force to the use of information on behavior characteristic of the groups to which he or she belongs: individuals should be accountable for their specific acts and not for their general proclivities.

Laurens Walker & John Monahan, *Social Frameworks: A New Use of Social Science in Law,* 73 Va. L.Rev. 559, 581 (1987). The following aptly describes the most appropriate guideline:

However firm the libertarian values barring the admission of character evidence, modern evidence law, as exemplified by the Federal Rules, contains several important exceptions allowing the introduction of character evidence. In criminal proceedings, the defendant may offer evidence of his or her own character and, if this occurs, the prosecution may offer character evidence in rebuttal. The defendant also may offer evidence of the victim's character, and if this occurs, the prosecution again may offer character evidence in rebuttal. In either civil or criminal proceedings, any party may offer evidence of the character of a witness. In addition, the prohibition against character evidence operates only when that evidence is used to prove that a person "acted" in conformity with his or her character on a particular occasion. Character evidence may be admissible for many other purposes such as proof of knowledge, intent, or preparation.

The rule against character evidence, therefore, suggests a bar to some, but by no means all, applications of social frameworks. Where traditional forms of character evidence are prohibited, social frameworks also should be barred; where traditional forms of character evidence are allowed, there is no reason to prohibit social frameworks.

*Id.* at 581–82. The introduction of the battered woman syndrome should not be a prosecutorial tool to covertly allow expert testimony regarding the dynamics and propensities of batterers intended to show a defendant acted in conformity therewith during the incident at issue.

[¶ 30] In this case, the assault itself was undisputed. Mr. Skinner did not first open the door to character testimony, and the testimony did not have an alternate proper evidentiary purpose such as intent or motive. Mr. Skinner argues the only purpose of the expert testimony regarding the behavior of a batterer was to leave the implication that, because he had a history of battering his wife, he had, in fact, threatened his wife with a knife, thus constituting aggravated assault. Under these circumstances, the profile testimony is inadmissible.

[¶ 31] Applying the harmless error analysis, we cannot discern from the record a reasonable possibility that the verdict might have been more favorable to Mr. Skinner if the error had never occurred. The expert's testimony, while discussing the pattern of

escalating violence, did not suggest the escalation would typically include the use of a deadly weapon, such as a knife. The victim ultimately testified, confirming her initial statement to the police at the time of the assault, that Mr. Skinner had threatened her with a knife. The jury also heard about Mr. Skinner's additional assault on his wife after his arrest and the threats he made against her if she testified at trial that he had used a knife—a fact that most likely persuaded the jury he had done so. The knife was also found in his pocket. There was ample evidence from which the jury could conclude the knife was used without drawing any indirect inference from the expert's profile testimony which covered only seven pages of the more than 530 pages of transcript. In closing argument, the state did not unduly reference the objectionable testimony. *See Ryan,* 988 P.2d at 57. Instead, the prosecutor made only two brief remarks regarding the expert's testimony, and neither referenced the profile-of-batterers testimony. Rather, the remarks were directed at the victim's behavior which is entirely appropriate. *See* 988 P.2d at 55, 57. We conclude the error did not affect Mr. Skinner's substantial rights and, therefore, was harmless.

### E. Coercion and Threats to Alleged Victim

[¶ 32] Mr. Skinner insists his right to due process of law was infringed by the victim's testimony, and he presents three bases for our review. First, Mr. Skinner contends the state impermissibly coerced and threatened the victim, resulting in unreliable testimony. Next, he argues he did not receive proper notice that the victim was detained as a material witness. Finally, Mr. Skinner maintains the victim was denied medical treatment, she was suffering from withdrawal, her home was burglarized, and her pregnant cat died while she was incarcerated. According to Mr. Skinner, the totality of these circumstances leads to the conclusion that he was denied his right to due process of law because the victim was coerced and could

not testify freely and truthfully. Whether Mr. Skinner's right to due process of law has been violated is an issue of law which we review de novo.

[¶ 33] Pursuant to W.R.Cr.P. 46.3,[5] the victim was detained as a material witness. The state petitioned the court for her detention as a material witness on the following bases: Mr. Skinner and the victim were observed together while he was released on bond, thereafter the victim filed a notarized letter indicating she had lied about Mr. Skinner's use of the knife, the state made several unsuccessful attempts to serve the victim, and the state had an overriding concern that she was avoiding service in order to refrain from testifying against her husband. The victim was also charged with avoiding service of a subpoena in violation of § 6-5-306.

[¶ 34] Mr. Skinner primarily relies on *Raphael v. State,* 994 P.2d 1004 (Alaska 2000), in which the Alaska Supreme Court held the coercion of a witness is a violation of the defendant's right to due process when the witness' statements are used against the defendant at trial. However, in *Raphael,* the victim was incarcerated, and the trial court "conveyed the strong impression that [the victim's] release from imprisonment was conditioned not only on *whether* she testified, but on *how* she testified." 994 P.2d at 1009. Specifically, the trial court said, *"And she's going to be—once the testimony is done, then we'll revisit it. And she gives testimony and we'll revisit the case, and presumably let her—she'll be able to be released." Id.* The court recognized that "[i]ncarceration is a necessary remedial tool in a judge's arsenal when attempting to secure a recalcitrant witness's testimony"; however, "when a witness can reasonably interpret a trial court's decision to imprison her as an attempt to influence the *substance* of her testimony, as the record indicates was the case here, the risk that the witness may not testify freely and truthfully is too great." 994 P.2d at 1010. Moreover, the court found the psychological effect of placing the victim's children in pro-

---

5. W.R.Cr.P. 46.3 provides in pertinent part:
 If, upon application filed by the state or the defendant and supported by oath or affidavit, it appears that the testimony of a person is materi-

al in a criminal proceeding, and if it is shown that it may become impracticable to secure the presence of the person by subpoena, a judicial officer may order the arrest of the person....

tective custody without a proper custody hearing was even more coercive than her own incarceration. *Id.* The Alaska Supreme Court held the trial court and the prosecutor's treatment of the victim had a coercive effect on her testimony which resulted in a violation of the defendant's due process right. 994 P.2d at 1011.

[¶ 35] We find the parallels of the instant case to *Raphael* to be less than "uncanny," as alleged by Mr. Skinner. The record does not support the claim that the victim was coerced into testifying favorably for the state. Rather, the prosecutor instructed her to testify truthfully and told her she would in turn be released from incarceration as explained in the following trial excerpt:

Q You are here today because of a subpoena that the State served on you; is that correct?

A Yes.

Q And is it fair to say that you are a little reluctant to testify today?

A Yes.

Q You and I have met to discuss this case, haven't we?

A Yes.

Q And there are charges pending against you now for avoiding service; isn't that correct?

A That's correct.

Q Okay. And you and I have made an agreement that if you testify truthfully, that those charges will be dismissed; is that correct?

A That's correct.

Q And is it your understanding or your desire to testify truthfully today?

A Yes, it is.

Mr. Skinner asks this court to give significant weight to the following emphasized testimony given by the victim on cross-examination:

Q Ms. Skinner, we talked yesterday about a deal you made with the State. Do you remember that?

A Yes, sir.

Q Okay. With every deal, there's also usually a counter threat; is that correct?

A Yes, sir.

Q What was that threat made by the State to you?

A There wasn't a threat made. There was just—when the trial is over, she'll have me released from jail, if I testify honestly.

. . . .

Q Okay. Now, what—did you know what they meant when they said the truth?

A Yes.

Q And what was that?

A The whole truth and nothing but the truth. So help me God, I will tell the truth.

Q The truth as to what? You knew what they wanted you to testify to, didn't you?

A Yes, they want the truth.

Q *And did they give you any hints of what that truth was?*

A *What I told them to begin with was the truth.*

Q *What you told who?*

A *What I told the police officers.*

(Emphasis added.) We have expanded the scope of the dialogue beyond that relied upon by the defense in order to provide an accurate context for the testimony. The victim's testimony reveals she planned to testify to the truth, as she understood it. "[J]uries, not appellate courts, should determine the credibility of witnesses who are party to prosecution agreements." *Kerns v. State,* 920 P.2d 632, 637 (Wyo.1996). The jury had the opportunity to assess the victim's testimony, which initially included a lack of memory as to the events in question followed by testimony which was consistent with her preliminary report to the police officers. In light of the totality of the victim's testimony, the jury returned a unanimous verdict. We will not second-guess the jury's credibility determination.

[¶ 36] Mr. Skinner further asserts his due process right was affected because neither he nor his counsel was notified that the victim had been detained as a material witness until after she had been arrested. In

*Kerns,* this court concluded the failure to disclose the fact that law enforcement had arrested a witness because she was attempting not to testify was not a constitutional error. 920 P.2d at 638. We reach the same conclusion in this instance.

[¶ 37] Mr. Skinner claims, apparently continuing to rely on *Raphael,* that the victim's testimony in which she claimed that, while she was incarcerated, she was denied medical treatment and suffered from alcohol withdrawal somehow establishes a violation of his right to due process. Even assuming he can make the connection between these facts and his right to due process, the record does not provide a sufficient basis to establish these facts or their relation to coercive testimony. Absent a record that clearly reflects factual indications of coercion, we have no basis for review. Likewise, Mr. Skinner points to the victim's claims that her home was burglarized and her pregnant cat died. All these circumstances may affect the victim's ability to testify truthfully, which the defense counsel attacked fully on cross-examination. Ultimately, however, the victim's credibility was an issue for the jury to consider. We conclude there was no error committed.

### F. Evidence of the Victim's Alleged Use of and Withdrawal from Methamphetamine

[¶ 38] Mr. Skinner contends the court erred in sustaining an objection at trial on the basis of relevancy. The defense counsel asked the victim the specific question: "Do you use methamphetamine?" This inquiry followed the questioning of the victim as to whether she was an alcoholic and whether she was suffering withdrawal, to which she responded in the affirmative. At trial, the defense counsel responded to the prosecutor's objection to relevancy and stated:

> Your honor, the relevance is that if she is going through all kinds of withdrawal and having pressure put on her by the State, her choices in deciding to testify for the State are very limited. She has been through everything possible by the State. And if she is withdrawing from methamphetamine, I think everybody in the legal community here knows that withdrawal from methamphetamine is severe.

The court sustained the objection. On appeal, Mr. Skinner argues the victim's methamphetamine use and possible withdrawal are relevant to her credibility and competency as a witness. Particularly, Mr. Skinner claims, "If [the victim] was in drug withdrawal, it is extremely likely that she would say anything in order to get out of jail." The burden is on the defendant to establish the trial court's evidentiary ruling was an abuse of discretion. *Trujillo,* 2 P.3d at 571.

[¶ 39] Mr. Skinner did not make an offer of proof at trial stating whether the victim actually used methamphetamine; was suffering from methamphetamine withdrawal; and, if so, to what extent it would affect the accuracy of her testimony. "In the context of evidentiary rulings at trial, this court has long adhered to the doctrine that a sufficient offer of proof is necessary so that we are adequately apprised of the nature of the excluded testimony." *Hermreck v. State,* 956 P.2d 335, 338 (Wyo.1998); *see also Sidwell v. State,* 964 P.2d 416, 420 (Wyo.1998).

> This requirement enables the trial court to be fully advised in the exercise of its discretion regarding the admission of evidence and allows the reviewing court to determine if prejudicial error resulted from the exclusion of the proffered testimony. Assertions and speculation in an appellate brief in no way take the place of an explicit offer of proof:
>
> > We suggest there is only one prudent way for an offer of proof to be made a[t] trial. The attorney who seeks to offer evidence, which has been refused or to which an objection has been upheld, should take the initiative. The offer of proof should then take the form of counsel's eliciting the proposed testimony directly from the witness, or entering the tangible evidence in the record, all outside of the hearing of the jury.

*Hermreck,* 956 P.2d at 338 (quoting *Rudolph v. State,* 829 P.2d 269, 275 (Wyo.1992)). We conclude our appellate review was impeded due to the absence of an offer of proof and a

clear indication in the record as to what the victim's testimony would have revealed. Consequently, Mr. Skinner failed to establish the trial court abused its discretion.

## CONCLUSION

[¶ 40] While errors were made in the trial of this case, a review of the complete record convinces us that Mr. Skinner received a fair trial and the verdict would have been unchanged had the errors not occurred.

[¶ 41] Affirmed.